[No. A011904. First Dist., Div. Four. Apr. 30, 1984.]

ROBERT E. WHITE et al., Plaintiffs and Appellants, v.
UNIROYAL, INC., Defendant and Respondent.

4

COUNSEL

Arthur A. Levy, Cavin & Levy, Mark H. Pierce, Clark & Glennon, John McBride and Wylie, Blunt & McBride for Plaintiffs and Appellants.

Weyman I. Lundquist, Ida O. Abbott and Heller, Ehrman, White & McAuliffe for Defendant and Respondent.

**OPINION**

**RATTIGAN, J.***—The separate appeals herein have been taken in personal injury actions, and an action for wrongful death, which were consolidated for trial. The jury returned a defense verdict in each action. The appeals are from judgments entered on the verdicts.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

PRELIMINARY SUMMARY

At pertinent times, Teledyne McCormick Selph, a corporation (Teledyne), operated a chemical manufacturing plant at Hollister. In 1974, Teledyne entered into a written contract with defendant and respondent Uniroyal, Inc. (Uniroyal). The contract obligated Teledyne to sell and deliver to Uniroyal specified and scheduled quantities of unsymmetrical dimethylhydrazine (UDMH), a chemical compound.

Teledyne proceeded to manufacture the UDMH at a facility constructed for the purpose at the plant in Hollister. Appellants Robert E. White and Roscoe Shields, and Robert C. Allen and Gerald Grimes, were employed by Teledyne in the manufacturing operation. On April 3, 1975, an explosion and fire occurred when a flammable gas escaped from equipment used in the operation. White, Shields, Allen, and Grimes were injured in the accident. Grimes subsequently died as a result of his injuries. White, Shields, and Allen commenced separate personal injury actions against several named entities (not including Uniroyal) and "DOE" defendants. Grimes' widow and children (appellants Beatrice S. Grimes, Ruby A. Grimes, and Daniel E. Grimes) commenced a wrongful death action against the same defendants.

The four actions were consolidated for trial. Thereafter, Uniroyal was named by amendment as one of the "DOE" defendants in the consolidated actions; the actions were dismissed as to the defendants who had initially been sued by name; and the complaints were amended to state three causes of action against Uniroyal alone. Uniroyal answered these causes of action, which were tried against it (i.e., Uniroyal alone) at a consolidated jury trial of the four actions. The jury returned a defense verdict in each action. Plaintiffs White, Shields, and Grimes appeal from the judgments consequently entered against them in their respective actions. Plaintiff Allen has not appealed.

THE PLEADINGS AS TO UNIROYAL

The causes of action stated and tried against Uniroyal will be summarized because they framed the issues presented on the appeals. The first cause of action was pleaded in an amendment of the complaint which had initially been filed by appellants Grimes. They alleged in this cause of action that at pertinent times Gerald Grimes, their decedent, had been employed by Teledyne at its plant in Hollister. They further alleged that on April 3, 1975, Uniroyal "negligently and carelessly operated, . . . maintained, controlled, inspected and performed supervisory duties with reference to [a] chemical reactor located at said plant . . ."; and that, as a proximate result, "haz-

ardous and volatile chemical fumes were . . . released from said chemical reactor and . . . did ignite[,] thereby causing Plaintiffs' decedent severe burns . . . which resulted in . . . his death . . . ." Uniroyal answered this cause of action, pleading general denials and alleging various affirmative defenses.

All of the plaintiffs joined in the second and third causes of action, which were stated in a stipulated amendment of the complaint initially filed by appellant Shields. It was alleged in each of these causes of action that at pertinent times Shields, White, and Allen had also been employed by Teledyne at the plant in Hollister, and that each had been injured in the fire on April 3, 1975. The plaintiffs added allegations charging Uniroyal with liability on the theories that Teledyne had contracted to "produce" (or to "create and manufacture") UDMH for Uniroyal, and its "production" involved a "peculiar" risk of harm in the absence of "special precautions" which Uniroyal had negligently failed to take.[1]

In an answer to the second and third causes of action, Uniroyal pleaded general denials and alleged as affirmative defenses (among others) that "Plaintiffs' employer was not Uniroyal's employee or independent contractor" and that "the production of UDMH is not [an] inherently dangerous or ultrahazardous activity."

## THE TRIAL AND FURTHER PROCEEDINGS

In the course of the consolidated jury trial, the court denied timely motions by Uniroyal for a nonsuit and for a directed verdict. On the tenth day of the trial, the jury returned defense verdicts on "Special Verdict" forms showing its determination in each action that Uniroyal had not been "neg-

---

[1]These allegations were made in the second cause of action as follows:

"II [¶] On and before April 3, 1975, . . . [Uniroyal] . . . entered into a written agreement with plaintiffs' employer under the terms of which plaintiffs' employer agreed to produce and sell to defendants unsymmetrical dimethylhydrazine (hereinafter UDMH).

"III [¶] . . . [Uniroyal] . . . knew, or in the exercise of reasonable care should have known, that the production of UDMH, including the storage in [sic: and] handling the component chemicals thereof, would necessarily involve abnormally dangerous activities and would necessarily create a peculiar or unreasonable risk of physical harm to others unless special precautions were taken.

"IV [¶] On or about April 3, 1975 . . . [Uniroyal] . . . so negligently and carelessly failed to make [sic: take] any special precautions as required and failed to require that any of such special precautions be taken . . . and as a direct and proximate result thereof an explosion occurred causing the injuries and damages . . . herein alleged."

In the third cause of action, the plaintiffs incorporated the foregoing allegations and further alleged: "On and before April 3, 1975, . . . plaintiff's [sic] employer undertook to create and manufacture UDMH" at Uniroyal's "special instance and requests," at its "expense," and for its "benefit."

ligent."[2] A poll of the jury established that the determination had been made by a 9-3 vote in each instance.

A "Judgment On Special Verdict" was entered in favor of Uniroyal in each of the four actions. Plaintiffs White, Shields, and Grimes filed timely notices of appeal from the judgments entered in their respective actions.

THE EVIDENCE

The trial record supports the summaries of the evidence which follow. The classifications shown in the captions are required by the issues presented on the appeals.

*The Evidence Pertaining to the Written*
*Contract Between Uniroyal and Teledyne*

As will appear in detail, this contract was entitled "Sales Agreement"; it provided that Teledyne thereby "sells" UDMH to Uniroyal; it identified the parties as "Seller" and "Buyer," respectively; and it did not expressly obligate Teledyne to manufacture the UDMH. As will also appear, the issues on appeal include a question whether the contract had the effect of limiting the parties' relationship to that of vendor and vendee, as a matter of law, to the exclusion of a relationship in which Uniroyal employed Teledyne to manufacture UDMH as an independent contractor. Evidence bearing on this question was liberally admitted, without objection or over objections in some instances. We summarize all of it here.

Uniroyal and Teledyne were brought together by James C. Dodgen. He testified that he was in business for himself as a chemical engineer. He had been in "contact" with UDMH since 1955. UDMH was used as a "propellant for rockets and missiles," and as an agricultural chemical. In and before 1974, Dodgen worked as a consultant to the U. S. Navy in the manufacture of UDMH, for the Air Force, at an ordnance station located at Indianhead, Maryland. At that time, the Air Force and Uniroyal were the

---

[2]Each form bore the caption of the respective action in which it was returned. Each read in pertinent part as follows:

"SPECIAL VERDICT
"(Based on BAJI 15.14)

"We, the jury in the above entitled action, find the following Special Verdict on the following issues submitted to us:

"Issue No. 1. Was the defendant [Uniroyal] negligent?

"Answer 'yes' or 'no.'" (Underscoring added by the foreperson of the jury.)

Each form also included interrogatories on "Issues" numbered 2 through 6 (on proximate cause, comparative negligence, and damages). The jury did not respond to these interrogatories because of the determination it had reached on "Issue No. 1" in each action.

only "primary users" of UDMH. The Air Force used it as rocket fuel. Uniroyal used UDMH in the manufacture of an agricultural chemical which it marketed under the trade name of ALAR. Uniroyal had regularly obtained UDMH from "FMC," a firm which manufactured it until 1974.

The supply of UDMH was "critical in the United States" when FMC stopped manufacturing it. FMC supplied Uniroyal with the UDMH it required in 1974. Uniroyal then had no supply to meet its needs, which were urgent because of schedules to be met in the production of ALAR for marketing in 1975. Early in 1974, Uniroyal approached Dodgen and asked him "to assist them in obtaining a source of supply" of UDMH. He and Uniroyal thereupon executed a written contract in which Dodgen was employed as a "Consultant" to "assist Uniroyal" with regard to several specified "subjects." One of the "subjects" was "[t]he routes [sic] to the manufacture of unsymmetrical dimethylhydrazine (UDMH)."

Dodgen testified that he then approached at least 25 different "companies," including Du Pont. It was suggested at Du Pont that Dodgen "contact Teledyne in California" because UDMH is a "hydrazine" and Dr. Donald Thatcher, an employee at Teledyne who had formerly worked for Du Pont, held a patent for a process used in the "manufacture" of hydrazines. Dodgen accordingly "contacted Teledyne, asked them what their interest was, told them what the requirement was." Teledyne expressed interest. In November of 1974, Dodgen visited Teledyne "to verify . . . that they were actually interested and would consider selling this material to Uniroyal." He discussed these subjects with Hugh Bennett, who was then the president of Teledyne.[3] Between mid-November and early December, Teledyne informed Uniroyal that it would "accept" a "purchase order" for UDMH.

Dr. Thatcher testified as follows: He is a chemist by profession. In 1974 and 1975, he was vice president of Teledyne in charge of "research and development." Plaintiff Robert Allen was executive vice president. Teledyne's principal business at that time was the production of "ordnance items," or "specialty explosives." Thatcher had worked for Du Pont from 1954 to 1972. During that period, he had been granted a patent on "a process or a portion of a process of development of UDMH."

Neither Thatcher nor Teledyne had engaged in commercial production of UDMH prior to 1974. Thatcher first learned that Teledyne "might be asked to produce it" in November of that year, when Dodgen approached Teledyne on behalf of Uniroyal. Dodgen met with Thatcher and other Teledyne

---

[3]It was shown at the trial that Hugh Bennett had died at an unspecified time after the 1975 accident.

personnel on two occasions in November. At the first meeting, Dodgen asked if Teledyne "would be interested in manufacturing or producing UDMH . . . ." It was agreed at this meeting that if Teledyne "was to manufacture UDMH" Thatcher would "designate the process that would be used . . . ." There were discussions of his "qualifications to understand production of UDMH" and his "knowledge of the field of chemistry involved in the manufacture of UDMH." At the conclusion of the meeting, it was agreed that Teledyne "would look at the details of a process for the manufacture of UDMH." It was also agreed that Dodgen "would see if his principals [sic] were interested in talking to us further about the manufacture of UDMH."

At the second meeting, Frederick Dovell was also present as a "Uniroyal representative." The process to be used had been "decided upon by Teledyne" at that time. There was a discussion of Thatcher's "concern about divulging any secrets of the process" and the desirability of "an agreement that would protect any secrets that might have to be divulged in the course of dealing" with Uniroyal. At or about this time, Dodgen and Teledyne agreed in writing that their negotiations might require the mutual disclosure of "certain proprietary data of either party concerning the UDMH and its associated derivatives"; that any such data would be identified before it was disclosed; and that the data would thereafter be "kept in confidence by both parties" for a period of 15 years from the "date of disclosure."

Thatcher testified that it was agreed at the second meeting that Teledyne "would have a contract to produce 300,000 pounds of UDMH for Uniroyal." The written contract was executed on December 5, 1974. Walter J. Cook signed it as Uniroyal's "Purchasing Coordinator." Charles D. Currier signed it as Teledyne's "Vice-President, Contracts." The document was captioned "Sales Agreement." It provided that Teledyne "hereby sells and agrees to deliver" to Uniroyal 300,000 pounds of UDMH in 1975. It further provided that Teledyne granted Uniroyal an "Extension Option" to buy 400,000 pounds in 1976 and 500,000 pounds in 1977. The contract included detailed shipping schedules to be met by Teledyne, in 1975, and Uniroyal's chemical specifications for UDMH. The contract price to be paid by Uniroyal in 1975 was $5.83 per pound. The prices per pound to be paid in 1976 and 1977 were to be negotiated if Uniroyal exercised its "Extension Option," but they were to be "lowered from $5.83 based on [Teledyne's] non-recurring expenses applied in [the] 1975 price structure."

The contract identified Teledyne and Uniroyal as "Seller" and "Buyer," respectively, and it included no provisions expressly obligating Teledyne to manufacture the UDMH. Walter Cook testified without objection that it was "strictly a purchasing contract for goods." Charles Currier testified without

objection that it was a "contract for the sale of goods." Currier also testified that Teledyne could have "fulfilled" the contract "had we been able to get UDMH in the Air Force or any place else that met Uniroyal's specifications." There was no evidence that UDMH was available from the Air Force at any time. Dodgen testified that Teledyne would have been "the sole commercial producer in the United States," and that Uniroyal was its only customer for UDMH. Thatcher testified that Teledyne "would have marketed any excess that we would be capable of making."

The contract required that the UDMH to be sold was to be manufactured in strict compliance with Uniroyal's specifications. It also provided that if Teledyne were "unable to supply Uniroyal's requirements," it (Teledyne) would "grant a non-exclusive license to Uniroyal to make or have made [sic] . . . its requirements for UDMH" with the use of Teledyne's "proprietary and patented processes."

There was evidence that Teledyne was required to build a manufacturing facility in order to perform the contract. Thatcher testified that Teledyne was a "sophisticated job shop," and that "[w]e build after we get a contract." In a telex sent to Uniroyal before the contract was signed, Currier confirmed that Uniroyal had "authorized" Teledyne "to proceed with preparatory work and to make commitments for the necessary facilities and materials to meet . . . delivery requirements." Teledyne commenced to construct a manufacturing facility at its Hollister plant before the contract was signed.

Thatcher testified that Teledyne's estimate of the cost of building the facility, and of the equipment in it, were "some of the things that went in to generate the price that was quoted to Uniroyal" before the contract was executed. Uniroyal knew that Teledyne did not "have a specific facility prepared to produce or manufacture UDMH," and there were discussions as to how soon Teledyne could "build the plant." It was "represented" to Uniroyal that Teledyne "could move faster than a big corporation in building a plant."

With reference to the provision in the contract that the 1976 and 1977 prices for UDMH were to be "lowered from $5.83" on the basis of Teledyne's "non-recurring expenses applied in [the] 1975 price structure," Currier testified that the term "nonrecurring costs" meant the cost of "a one-time occurrence" which would not "reoccur during . . . continued production," such as the cost of a building. Currier also testified that Uniroyal agreed that "whatever nonrecurring costs were," they were "covered" in the "contractual price." Walter Cook testified that it was he who had made the decision, for Uniroyal, fixing the 1975 price for the UDMH at $5.83

per pound. It had not been Cook's understanding that the price for the 300,000 pounds was to "include the total cost of the facility" that Teledyne "was going to put up."

*The Evidence of Participation by Uniroyal in*
*the Manufacture of UDMH at the Teledyne Plant*

Construction of the UDMH facility at the Teledyne plant was continued after the contract was executed. Currier testified that the facility was designed by Teledyne employees; that it was built on Teledyne's property; and that Teledyne alone employed the personnel who worked at the facility, maintained its "security," controlled access to it, and determined when it would be used and for what purpose. Teledyne commenced to use it for the production of UDMH in or about January, 1975. In letters written in February, Teledyne and Uniroyal acknowledged that they had exchanged disclosures of specified "proprietary data" concerning processes used by Teledyne in the manufacture of UDMH and its use by Uniroyal in the production of an agricultural chemical.

Between January 1 and April 3, James Dodgen and Frederick Dovell visited Teledyne's UDMH facility on approximately ten occasions each. They regularly signed themselves in on a "Visitor's Register" as "representing Uniroyal." Dodgen testified that he visited the facility in January to see what "need[ed] to be done to have the plant operational." He visited it again, in February, "to see that they did start up on schedule." At the plant in March, he "assisted" Gerald Grimes in the "start-up" of one of the phases of the production of UDMH. Dodgen also testified, however, that his "assignment" at the plant was to keep Uniroyal "advised of the progress." He was told by Uniroyal to "assist" Teledyne in the manufacturing process, and to "advise and be as helpful as possible," but not to "interfere." All he could do without "interfering" was "to make an observation and then tell Teledyne management this is what I saw, I don't think this is right." Dodgen did not "give any direction to anyone from Teledyne as to how to do anything."

Frederick Dovell was a chemist and a salaried employee of Uniroyal. There was testimony that he had experience as a chemical engineer and "knowledge" of chemical manufacturing processes. He testified that his "function" at the Teledyne plant was "to be an observer, representative of Uniroyal at the invitation of Teledyne to follow the progress"; to make any "suggestions" requested by Thatcher on a phase of the production of UDMH; and to provide Uniroyal "with the results of my observations on the progress, so they might know whether it was likely to obtain the new UDMH on schedule or not."

Several employees of Teledyne testified that Dodgen and Dovell were "observers," or "customer consultants," or "customer source representatives" working for Uniroyal at the Teledyne plant. There was evidence that such persons frequently visited the plant during the manufacture of a product by Teledyne pursuant to a contract. One Teledyne employee testified that they had "final quality control on the product," and whether it met "the customer's specifications," but that they had "very little authority . . . in the build-up or manufacture of the product. How we do it, is primarily our business." Thatcher was directly asked whether Dodgen and Dovell had "the right to tell you how to make this product." He testified, without objection, that he "did not understand it that way" and that he "believe[d] Teledyne . . . was in control of making the product."

There was nevertheless conflicting evidence as to who was in "control" of the manufacturing process or had the right to control it. Allen testified that Thatcher directed the manufacture of the first 1,000 pounds of UDMH in 70-gallon reactors, and the use of a nitrite as a "starting material" instead of nitrogen tetroxide. Informed of these actions, "Uniroyal was upset and very definitely directed us to shift our efforts to the process intended" and to use 3,000-gallon reactors. Teledyne complied.

Neither Thatcher nor Teledyne had any previous experience in the commercial production of UDMH. Thatcher knew that Dodgen had been "a consultant in the area of UDMH manufacture," and that he had been "involved" in its "production." Dodgen testified that he had "seen" UDMH plants in operation at Indianhead, in Baltimore, and in Europe. At Indianhead, he had worked for the Navy in the actual manufacture of UDMH. He explicitly testified that it was "absolutely true" that he "knew more about the production of it than Teledyne did."

When Dodgen met with Teledyne personnel before the contract was executed, he "had no reason to believe that they lacked chemical engineering capacity." After seeing the "Teledyne effort" in operation, however, Dodgen thought it "questionable whether they had the capability to do the proper engineering design of the plant." In February, 1975, he reported to Uniroyal that "it appeared that Teledyne lacked the capacity to comply with the contract" and "to get the process together and operating."

Dodgen also observed that Teledyne personnel had "cut the corners on safety" in the manufacturing process. He became "concerned" about Teledyne's "lack of operating procedures, the lack of operating training, and this kind of thing, which affects the safety of operation." He perceived in Teledyne employees a "lack of knowledge" of the "hazardous nature of what they were doing." He was particularly concerned that they were wear-

ing street clothes in the UDMH facility, which demonstrated ignorance of what happens "when you have a flash fire."

In February, Dodgen and Dovell inspected the UDMH facility together. Dodgen testified that they observed "certain problems," and "proceeded to tell the Teledyne management that these are some of the problems which we think you are missing . . . ." They "discussed with Teledyne . . . the lack of operating procedures, the lack of a schedule to train the operators, the lack of protective clothing, and certain specific safety deficiencies . . . ." These problems were communicated to Teledyne in a written report which Dodgen described as a "humanitarian effort."[4] He had the "feeling . . . that the Teledyne personnel were receptive to what we said." He subsequently observed that they "had come up with an operating procedure, sort of, and they had made some corrections to some safety items, such as kick boards and head clearances, and this kind of thing."

Dovell testified that he and Dodgen inspected the UDMH facility at Bennett's suggestion. "And in so doing we observed certain situations that we felt were not likely to lead to the successful completion of the project on time." Dovell described the results as follows: "We made certain suggestions to Teledyne that in our best evaluation would lead to improved operations, more safe operations in the interest of obtaining the product; and if you will allow me to inject a moral sense [*sic*] to further protect the employees from hazards that may not have been obvious to those who were erecting the plant." Dovell described the written list (see fn. 4, *ante*) as "seven direct suggestions on safety and five questions relating to production or safety." He explained its preparation in this testimony:

"I saw it as an example of a concern that Uniroyal had to further the safe production of material . . . . If it's unsafe, a hazard is involved, then there is a possibility of an interruption; interruption would mean loss of our product. To the situation of concern for the safety of the people, . . . if I can draw an analogy, if I were to observe somebody walking in front of a car and didn't take some action to pull them back, that would be a lack of

---

[4]This report was received in evidence. It is a six-page list in Dodgen's handwriting, entitled "Review of Operation." The words "recommendations" or "suggestions," or the equivalent, are not used in it. The first five pages show seven enumerated entries in identical formats. For illustration, we quote two of the entries as follows (italics added):

"1. Problem: No operating procedures or batch sheets. [¶] Impact: Not possible to operate [*sic*] or train personnel. *Company negligent.* [¶] Corrective Action: Prepare same.

"2. Problem: No trained operators. [¶] Impact: Not possible to operate with designers or engineers. [¶] Corrective Action: Train operators and provide slow walk thru."

The last page of the list reads in full as follows (paragraphing omitted):

"8. Questions: a. Kick plates for platforms and stairways? b. Housekeeping. Clean area or tripping hazards? c. Respirators and masks for operators during . . . addition [of a specified chemical]? d. Fan guards on roof? e. Is open wiring dead?"

concern . . . as a person . . . . I felt at the time that I had the authority to join with Mr. Dodgen in presenting such a list."

Concerning the written list, Allen testified that Dodgen and Dovell approached him in February 1975, when he was about to start a "full scale reaction." They "said, 'We don't want you to go on with reaction.'" When Allen asked why, one of them "said, 'Well, we have been through the facility . . . looking it over and there are some changes we want . . . you to make in the facility and the setup.'" Allen insisted that they talk to Hugh Bennett. Dodgen, Dovell, and Allen thereupon went to Bennett's office, where the written "list of changes" was handed to Allen. (See fn. 4, *ante.*) Bennett read the list and asked Allen "how long it would take." After a discussion with Thatcher and another Teledyne employee, Allen told Bennett that "it would take ten days to two weeks to complete." Bennett "looked at Dodgen and Dovell and said, 'Is this acceptable?' And they said it was . . . and he said, 'All right. Take the corrective action.'" Allen testified that "the job" was then "closed down for two weeks" so that Teledyne could "implement the changes" detailed on the written list. With Bennett's "direction and approval," Teledyne "corrected everything on the list."

*The Evidence Pertaining to the Equipment*
*and Procedures Used in the Manufacture*
*of UDMH, and to the Accident.*

The UDMH facility at the Teledyne plant consisted of a building which was partitioned into three separate "bays" and a control room. A reactor was built in each of the bays. Each bay was also equipped with a switch-controlled "deluge system," which was an installation of sprinklers designed to drench the bay with water when the system was manually activated.

Thatcher testified that he had developed the "chemical process" which was used in the manufacture of UDMH at the facility. He had instructed Teledyne personnel that the process was to "be conducted in a proper sequence." The steps to be followed in the sequence were prescribed in a written list of "Standard Operating Procedures" which was in the control room when the accident occurred on April 3, 1975.

The "first reaction stage" in the manufacture of UDMH is called "nitrosation." A nitrosation reaction occurs when dimethylamine (DMA) and nitrogen tetroxide are brought together in a reactor after other chemicals have been mixed in the reactor. The accident occurred when DMA vapor escaped

and exploded while a nitrosation reaction was being performed in one of the Teledyne reactors on the night of April 3, 1975. This reactor was a cylindrical metal vessel which held thousands of gallons of fluid and stood 10 to 15 feet high. It was sealed except for intake connections at the bottom and a removable glass "porthole" at the top. The porthole was accessible from a catwalk which was reached from a ladder on the side of the reactor. When the porthole was closed, it was bolted shut to seal it against pressure in the reactor.

Preparation for the nitrosation reaction was conducted in a precise sequence which was detailed in Teledyne's "Standard Operating Procedures." The reactor was first flushed out and partly filled with deionized water. When the proper water level had been reached, 5,000 pounds of potassium carbonate (a "salt material"), and a small quantity of palladium (a salt-like material which served as a "catalyst"), were poured into the reactor through the open porthole. These materials were to be stirred in the reactor for about five minutes before the DMA was added. The DMA used in the nitrosation reaction was kept in a water solution which was stored in a pressurized tank. The DMA flowed to the reactor through a line which ran from the tank to a connection at the bottom of the reactor. There were four hand-controlled valves along the line.

Several witnesses testified that DMA vapor is highly flammable. Dodgen testified that it may be ignited by a mere "spark," including a "static spark" generated by body movement. He also testified that "if you had a room with DMA vapor in it . . . the best thing to do would be to operate the deluge system and absorb the DMA." Because of its high flammability, the DMA was not to be introduced into the reactor unless and until the porthole had been closed. The "Standard Operating Procedures" directed: "When all salt added, *close port* and . . . mix for five (5) minutes." (Italics added.) Thatcher testified that it was necessary to close the porthole at that point because "this is a pressure reaction and you do not want dimethylamine [DMA] to escape through an open port."

Thatcher was not present when the accident occurred on the night of April 3, 1975, but he was subsequently chairman of a three-member "accident investigation committee" appointed by Hugh Bennett. After conducting an investigation which Thatcher described in detail, the committee had prepared a written report which was received in evidence. Thatcher further testified, in part from the report, that the Teledyne personnel working at the reactor that night included Robert Allen, Gerald Grimes, Robert White, and Roscoe Shields. Thatcher described Allen as "the person in control that evening." James Dodgen was not present, but Frederick Dovell was in the control room as an "observer."

The accident investigation committee had "concluded" that "the process steps had been expedited improperly" that night, and that "people had not followed . . . [the] . . . standard operating procedures . . . ." After the potassium carbonate and the catalyst had been poured through the porthole, "the procedure was not completely followed properly" because the first three valves in the line from the DMA tank were opened *before* the porthole was closed. The fourth valve was "mechanically faulty." The DMA consequently flowed into the reactor while the porthole was open, the "DMA pressure built up to such an extent" that the porthole could not be closed, and DMA vapor escaped through it. "A leaky valve in proper sequence would not have been a fire hazard" if the porthole had been closed. After the accident, Allen had told Thatcher that he (Allen) had "connected up" the DMA line "out of sequence."

Allen testified that he arrived at the Teledyne plant at 5 p.m. on April 3, 1975. At that time, Gerald Grimes and another employee were pouring the catalyst into the reactor through the porthole. Allen did nothing until someone "called down from the catwalk and said the catalyst was loaded." Allen knew that the "next procedure" was to "[c]lose the port . . . and then add DMA." He asked Grimes "if he wanted DMA up to the reactor," and Grimes said " 'Yes.' " Allen connected the line from the DMA tank and opened all the valves in it except the last one, which was at the bottom of the reactor. He was then told that the porthole at the top of the reactor was open. Until that moment, Allen had thought the porthole was closed. He next saw the "whole bay full of what seemed to be fumes or steam." Realizing that DMA vapor was escaping, he pushed a button to activate the deluge system in the bay and drench the area with water. The system did not function. Allen was then engulfed in a "ball of flame" which "melted" his clothes and inflicted severe burns on his body.

Similar descriptions of the accident were given in testimony by appellants White and Shields. Gerald Grimes died from burns he received in the fire. White, Shields, and Allen were severely injured. Thatcher described several possible "ignition sources" which could have caused the fire, including electrical equipment and "motors in the area." As far as the accident investigation committee could determine, the deluge system was working at the time of the accident. Thatcher also testified that the people working at the reactor were "supposed to be wearing . . . so-called acid suit[s]." He did not know whether the acid suits "had any fire retardant qualities or not."

The plaintiffs called William J. Ramsey, a chemist, as an expert witness. He testified that he was familiar with DMA, which he described as a "derivative of ammonia" and a "gas" which is "sold and transported in a

solution in water." The water solution is highly flammable, and it vaporizes when it is "exposed to the open atmosphere." DMA vapor is more flammable than hydrogen. Generally recognized "precautions" to be taken with it were to "keep the exposure to people to minimum, keep the exposure of potential sources of ignition to a minimum."

The plaintiffs also called Milo Bell as an expert. He had extensive academic and professional qualifications as a safety engineer and as an expert witness "with reference to hazardous materials." He testified that he knew of "generally recognized precautions" that should be taken in the handling of DMA, which he described as a "gas" with "a potential for both fire and explosions." After detailed voir dire by defense counsel concerning Bell's experience with DMA, the trial court explicitly ruled that he was qualified as an expert on the subject. Bell then testified as follows:

". . . [T]here are in the field of safety engineering, a variety of tools to avoid . . . problems" involved in the escape of DMA into the atmosphere. The porthole on the Teledyne reactor should have been "interlocked to a set of electrically controlled valves" which would have prevented DMA from being introduced into the reactor when the porthole was open. An "interlock system" of this type was available in 1974 at a cost which Bell estimated at $60,000 or less. To "warn the employees" if DMA were released, the facility should also have been equipped with combustible gas sensors and related electrical "control circuitry" which would automatically "activate and alarm depending on the threshold of the mixture" involved. These devices would also have activated the deluge system automatically. A "sensor system" equipped with the devices would have cost between $10,000 and $15,000.

Bell also testified that Teledyne's facility was a "new . . . plant to produce UDMH"; that its manufacturing procedure was an "untried" chemical process; and that the employees should have worn "flame-resistant garments" until the process had "been proven." The so-called "acid suit" used at chemical plants is generally not flame-resistant. Finally, spark-proof and "explosion-proof" motors should be used in all manufacturing processes involving "flammable atmospheres."

Delmar Springer was an employee of Teledyne who had served on the accident investigation committee with Thatcher. Springer testified in effect that the UDMH facility had not been equipped with any of the safety devices or systems Bell had described. Springer had learned in the investigation of the accident that "protective clothing was available and on site," but he did not recall whether it consisted of "acid suits only." Allen testified that no one from Uniroyal, or at Teledyne, had ever suggested equipping the facil-

ity with "an explosion safety device," or that "the workmen should have a . . . flame retardant suit rather than an acid suit."

REVIEW

I. *The Refusal to Give Certain Jury Instructions*

The trial court refused to give any of several jury instructions requested by the plaintiffs (including appellants) on the so-called "peculiar risk doctrine." Appellants claim reversible error.

One of the instructions they requested was BAJI No. 13.21 (1977 rev.), which is based on sections sections 413 and 416 of the Restatement Second of Torts.[5] Others were requested on the authority of sections 413, 416, 423, or 427. ■ These four sections, which are applicable in California law, state some of the several exceptions to the general rule that the employer of an independent contractor is not liable for the latter's torts. (See § 409; *id.,* com. a; see also *Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 508 [156 Cal.Rptr. 41, 595 P.2d 619]; *Griesel* v. *Dart Industries, Inc.* (1979) 23 Cal.3d 578, 585 [153 Cal.Rptr. 213, 591 P.2d 503]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 657, p. 2937.) The exceptions specifically stated in the four sections are variations of the peculiar risk doctrine, the application of which may establish liability, to injured third parties, in a person who employs an independent contractor to conduct an activity involving a "peculiar risk" of harm or a risk (or "danger") defined in similar terminology. (See fn. 5, *ante.*)

Liability pursuant to section 413 is *directly* imposed on the employer of an independent contractor for his "personal negligence" only. (Rest. 2d Torts, Introductory Note to ch. 15, Topic 1; see *Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502 at pp. 508-509; *Griesel* v. *Dart Indus-*

---

[5]The Restatement Second of Torts is hereinafter cited on occasion as the "Restatement" only. Citations to a "section" (or to "§") are to the Restatement except where otherwise indicated. Sections 413 and 416 respectively provide (italics added):

"§ 413. . . . One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a *peculiar* unreasonable *risk* of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if *the employer* [¶] (a) fails to provide in the contract that the contractor shall take such precautions, or [¶] (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

"§ 416. . . . One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a *peculiar risk* of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by *the failure of the contractor* to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

*tries, Inc., supra,* 23 Cal.3d 578 at pp. 585-586.) Liability pursuant to sections 416, 423, or 427 is vicariously imposed on him "for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault." (Rest.2d Torts, Introductory Note to ch. 15, Topic 2; cf. *Aceves* v. *Regal Pale Brewing Co., supra; Griesel* v. *Dart Industries, Inc., supra.*)

■ The peculiar risk doctrine may be applied only to a person defined in the Restatement as "[o]ne who employs an independent contractor to do work . . . ." (Rest.2d Torts, §§ 413, 416, quoted in fn. 5, *ante*; see also § 409, com. a, com. b.) The doctrine may therefore be applied only where an employer-independent contractor relationship exists in fact. On the premise that there was an issue for the jury as to whether this relationship existed between Uniroyal and Teledyne (hereinafter the "independent contractor issue"), appellants also requested requested an instruction defining an "independent contractor."[6] Anticipating that the instruction would be given, Uniroyal requested several instructions which distinguished between an "independent contractor" and a mere vendor of goods. The trial court refused to give any of the instructions requested on the independent contractor issue, thereby withholding it from the jury entirely.

■ Appellants have not explicitly complained of the refusal to instruct on the independent contractor issue. This refusal is nevertheless inseverable from their claim of error in the failure to instruct on the peculiar risk doctrine because there would have been no basis for application of the doctrine unless there had been a determination that Uniroyal had employed Teledyne to manufacture UDMH as an independent contractor. The existence of an employer-independent contractor relationship is commonly relevant where a person has been "employed" to do work and the question in a subsequent action is whether he was employed as an independent contractor, in which case his employer would not ordinarily be liable for his torts; or whether he was an "employee" (in the sense of a "servant," or "agent") for whose torts the employer might be liable pursuant to the doctrine of respondeat superior. (See, e.g., Civ. Code, § 3358; 1 Witkin, Summary, *op. cit. supra,* Agency and Employment, § 155, pp. 754-755; as to the distinction cited, see *id.,* § 11, par. (1), p. 650.)

---

[6]The instruction was requested as follows: "An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. The chief consideration which determines one to be an independent contractor is the fact that the employer has no right of control as to the mode of doing the work contracted for."

The language of this instruction was indirectly quoted from *Green* v. *Soule* (1904) 145 Cal. 96 [78 P. 337], which was the authority cited for it. (See *id.,* at p. 99.) Plaintiff Allen requested a similar instruction on the authority of Labor Code section 3353.

At least one BAJI instruction has been tailored for the situation where this distinction between an independent contractor and an "employee" is to be drawn by a jury. (See BAJI No. 13.20 (1982 rev.).) The distinction is not involved here because no one has contended, and there is no evidence, that Teledyne was an "employee" of Uniroyal within the meaning of the doctrine of respondeat superior. According to the instructions requested by both sides on the independent contractor issue, however, the distinction to be drawn from the evidence was whether Teledyne had been employed by Uniroyal to manufacture UDMH, as an independent contractor, or whether it was a mere vendor of UDMH to Uniroyal. ■ In the "simple vendor-purchaser situation," there is "no basis for holding the purchaser liable for the negligence of the vendor," but the employer of an independent contractor may be liable to injured third parties if the peculiar risk doctrine applies. (See *Ramsey* v. *Marutamaya Ogatsu Fireworks Co.* (1977) 72 Cal.App.3d 516, 525-527 [140 Cal.Rptr. 247].) The distinction to be drawn here is thus as vital as the one more commonly drawn between an independent contractor and an "employee."

■ The independent contractor issue was expressly tendered in appellants' amended pleading. (See fn. 1, *ante.*) Uniroyal joined the issue with its responsive denials and its allegation as an affirmative defense that Teledyne was not its "independent contractor." The instructions requested on the issue would have joined it for determination by the jurors as a foundation for their deliberations in response to the instructions on the peculiar risk doctrine if the latter had been given as requested. Having requested an instruction on the independent contractor issue, appellants did not waive the right to have this court consider the question whether the trial court erred in refusing to give it. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 194, p. 3013.) Uniroyal has expressly briefed this question. Under all the circumstances, the question is to be considered as part of appellants' contention that the court erred in failing to instruct on the peculiar risk doctrine as requested. We consider it first.

### The Refusal to Instruct on the Independent Contractor Issue

■ An "independent contractor" is generally defined as a person who is employed by another to perform work; who pursues an "independent employment or occupation" in performing it; and who follows the employer's "desires only as to the results of the work, and not as to the means whereby it is to be accomplished." (*McDonald* v. *Shell Oil Co.* (1955) 44 Cal.2d 785, 788 [285 P.2d 902]; *Green* v. *Soule, supra,* 145 Cal. 96 at p. 99; *Dorsic* v. *Kurtin* (1971) 19 Cal.App.3d 226, 238 [96 Cal.Rptr. 528]; 1 Witkin, Summary, *op. cit. supra,* Agency and Employment, § 10,

pp. 649-650; see also Lab. Code, § 3353; Rest.2d Agency, § 2, subd. (3); Rest.2d Torts, § 409, com. a.) ▇ The most significant factor in determining the existence of an employer-independent contractor relationship is the right to control the manner and means by which the work is to be performed. (Cf. *Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946, 949 [88 Cal.Rptr. 175, 471 P.2d 975]; *Green* v. *Soule, supra; Resnik* v. *Anderson & Miles* (1980) 109 Cal.App.3d 569, 572 [167 Cal.Rptr. 320]; *Dorsic* v. *Kurtin, supra.*) "If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established. [Citation.]" (*Tieberg* v. *Unemployment Ins. App. Bd., supra,* at pp. 946-947 [quoted in *Societa per Azioni de Navigazione Italia* v. *City of Los Angeles* (1982) 31 Cal.3d 446, 458 (183 Cal.Rptr. 51, 645 P.2d 102].)

▇ The instruction requested by appellants on the independent contractor issue was an accurate statement of the foregoing principles. (See fn. 6, *ante*; see also BAJI No. 13.20 (1982 rev.) third and fourth pars.) The reasons for its refusal, and the trial court's decision to withhold that issue from the jury, are shown in the record. Early in the trial, the court expressed the view that the relationship between Uniroyal and Teledyne was to be determined from their written contract only, and that construction of the contract was not a "function of the jury." When Uniroyal's motion for a nonsuit was denied, one of the plaintiffs' attorneys stated: "The problem . . . here is not just construing a contract, but construing . . . a relationship. The contract may be part of that." The trial court agreed, stating, "[i]t's for that reason that I'm suggesting the possibility of . . . instructions on it." During a reported conference on instructions later, however, it was made clear that the instructions requested on the peculiar risk doctrine would not be given because the court was unwilling to "extend" the doctrine to "a contract to purchase materials."[7] The court thus determined in effect that only a vendor-purchaser relationship existed between Teledyne and Uniroyal, and that Uniroyal did not employ Teledyne to manufacture UDMH as an independent contractor, as a matter of law in each instance.

▇ When there is a material issue as to whether an employer-independent contractor relationship exists, its determination is a question of fact for the jury if the evidence is in conflict. (*Courtell* v. *McEachen* (1959) 51

---

[7]The court was asked at this conference about previous "off the record" discussions of instructions which the plaintiffs had requested on the peculiar risk doctrine. The court stated in pertinent part: "I think I made it rather clear what my view was . . . . And as I indicated earlier, I think that to extend this [the peculiar risk doctrine] . . . to—*a contract to purchase materials* would lead to terribly widespread results, which just aren't good policy, and I don't think is going to be adopted by the Supreme Court. If I'm wrong, they'll adopt [*sic*], and that will be the rule, but it isn't now. . . ." (Italics added.)

Cal.2d 448, 456 [334 P.2d 870]; see *Stilson* v. *Moulton-Niguel Water Dist.* (1971) 21 Cal.App.3d 928, 936 [98 Cal.Rptr. 914].) ▮ The written contract between Teledyne and Uniroyal was evidence that they were respectively the vendor and purchaser of UDMH. The trial court's determination that they were nothing more, as a matter of law, was based on the premises that interpretation of the instrument was a function of the court, not the jury; that it was to be construed as a "contract to purchase materials" (see the text at fn. 7, *ante*); and that the factual inquiry required by the evidence terminated at that point. The court's application of the first premise was correct. (See, e.g., *Clark* v. *Lesher* (1956) 46 Cal.2d 874, 883 [299 P.2d 865]; *Schwartz* v. *McGraw-Edison Co.* (1971) 14 Cal.App.3d 767, 778 [92 Cal.Rptr. 776, 66 A.L.R.3d 808].) The second premise was not disputed, in that the written agreement was a "contract to purchase materials" on its face.

In applying the third premise, however, the court determined in effect that a vendor-purchaser relationship between Teledyne and Uniroyal precluded the existence of an employer-independent contractor relationship between them: i.e., that the two relationships were mutually exclusive as a matter of law. Decisions cited by Uniroyal on this subject support the proposition that a contract for the sale of a specially manufactured product retains its character as a sales contract despite the fact that the rendition of services is merely *incidental* to its performance by the seller. (See, e.g., *Reininger* v. *Eldon Mfg. Co.* (1952) 114 Cal.App.2d 240, 241-244 [250 P.2d 4]; *Bonebrake* v. *Cox* (8th Cir. 1974) 499 F.2d 951, 957-960; *Aluminum Company of America* v. *Electro Flo Corp.* (10th Cir. 1971) 451 F.2d 1115, 1118.) Another source cited by Uniroyal distinguishes between a vendor and an independent contractor for purposes of tort liability, but in the circumstances of an ordinary sale and not on the basis of evidence supporting a determination that the same person could be both. (See Williams, *Liability for Independent Contractors* (1956) 14 Cambridge L.J. 180.) These authorities do not support the determination that a vendor-purchaser relationship and an employer-independent contractor relationship are mutually exclusive as a matter of law.

Prior to the adoption of the Uniform Commercial Code in California, the employment of an independent contractor to perform work could result in a "sale" of the finished product by the contractor to the employer, for purposes of the Uniform Sales Act, if the product were "suitable for sale to others" in the ordinary course of the contractor's business. (See *Aced* v. *Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573, 580-581 [12 Cal.Rptr. 257, 360 P.2d 897].) ▮ Where an independent contractor is employed to manufacture a product, and title to the finished product passes from the contractor to the employer, definitions in the Uniform Commercial Code

may now operate to make the transaction a "sale" of "specially manufactured goods," in which the employer is the "buyer" and the contractor is the "seller," without affecting the employer-independent contractor relationship between them. (See Cal. U. Com. Code, § 2106, subd. (1); § 2105, subd. (1); § 2103, subds. (1)(a), (1)(d).) A vendor-purchaser relationship and an employer-independent contractor relationship are therefore not mutually exclusive as a matter of law. ■ The trial court correctly withheld interpretation of the "Sales Agreement" from the jury, and correctly construed it as a "contract to purchase materials" (see the text at fn. 7, *ante*), but the requisite inquiry did not end at that point if there were evidence supporting a determination that Uniroyal also employed Teledyne to manufacture UDMH as an independent contractor.

Uniroyal and Teledyne called their written contract a "Sales Agreement," addressed it to the sale and delivery of UDMH, and identified themselves in it as "Buyer" and "Seller," respectively. ■ It is settled, however, that contracting parties' descriptions of themselves are not conclusive evidence of their actual relationship. (See *Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 176 [151 Cal.Rptr. 671, 588 P.2d 811]; 1 Witkin, Summary, *op. cit. supra,* Agency and Employment, § 29, p. 662.) ■ The labelling language used in the "Sales Agreement" therefore did not establish that the parties entered into a vendor-purchaser relationship and nothing more. For the same reason, this was not established by the testimony expressing the legal conclusions that the agreement was a mere "contract for the sale of goods" or a "purchase order."

■ Other evidence of the actual relationship between Teledyne and Uniroyal is to be viewed in the light most favorable to appellants as the parties who requested the instruction on the independent contractor issue. (See *Selinsky* v. *Olsen* (1951) 38 Cal.2d 102, 103 [237 P.2d 645]; *Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 634 [128 Cal.Rptr. 807, 91 A.L.R.3d 1]; *Christian* v. *Bolls* (1970) 7 Cal.App.3d 408, 415-416 [86 Cal.Rptr. 545].) It includes evidence, or supports inferences, to the following effects:

In 1974, Uniroyal urgently needed UDMH to meet its production and marketing requirements for ALAR in 1975. No one was manufacturing it for sale, or selling it, to commercial customers. It obviously had to be manufactured before Uniroyal could buy it. Dodgen testified that Uniroyal asked him "to assist them in obtaining a source of supply" of UDMH, not a vendor of it. Uniroyal engaged him to find "routes" to its "manufacture" only. He was directed to Teledyne because Thatcher held a patent on a process used in the "manufacture" of UDMH and other hydrazines. The

negotiations which preceded execution of the written contract were addressed to the "manufacture" or "production" of UDMH by Teledyne.

Teledyne specially constructed the manufacturing facility for the purpose of performing its contractual obligations to Uniroyal. The need for the facility, and the fact that it would be built, were known to Uniroyal when the contract was being negotiated. Teledyne commenced its construction before the contract was executed, and Uniroyal "authorized" this. The parties calculated the 1975 contract price so that Teledyne would recover the full cost of the facility during the first year of its operation. The contract required that the UDMH be manufactured in strict compliance with Uniroyal's specifications. A principal purpose of Dodgen's and Dovell's periodic visits at the Teledyne facility was to insure this compliance.

Thatcher was initially concerned about "divulging any secrets" in Teledyne's manufacturing process, and the desirability of protecting them against disclosure by Uniroyal. There was an agreement to this effect, and the parties subsequently exchanged "proprietary data" relative to Teledyne's processes in the manufacture of UDMH and its use by Uniroyal. The written contract obligated Teledyne to license Uniroyal to use its (Teledyne's) "proprietary and patented processes" for the manufacture of UDMH if Teledyne were "unable to meet Uniroyal's requirements" as detailed in the contract.

It readily appears that the foregoing facts are not characteristic of the conventional vendor-purchaser relationship between the parties to a mere "contract for the sale of goods." The totality of these facts supports inferences that the relationship between Teledyne and Uniroyal was far more; that Uniroyal sought out and employed Teledyne to manufacture UDMH, not merely to sell it; and that Uniroyal employed Teledyne to "render services," or to "perform work," within the meaning of the first element of the definition of an "independent contractor" as stated in the instruction requested by appellants on the independent contractor issue. (See, e.g., McDonald v. Shell Oil Co., supra, 44 Cal.2d 785 at p. 788; Green v. Soule, supra, 145 Cal. 96 at p. 99; Dorsic v. Kurtin, supra, 19 Cal.App.3d 226 at p. 238; 1 Witkin, Summary, op. cit. supra, Agency and Employment, § 10, pp. 649-650; Rest.2d Agency, § 2, subd. (3); see also fn. 7, ante.)

It is undisputed that Teledyne was engaged in an independent chemical business during its manufacture of the UDMH. This fact established the second element of the definition of an "independent contractor." (See, e.g., McDonald v. Shell Oil Co., supra, 44 Cal.2d 785 at p. 788; Dorsic v. Kurtin, supra, 19 Cal.App.3d 226 at p. 238.) There was evidence (among

conflicting evidence) that Teledyne controlled the manufacturing process, or had the right to control it, within the meaning of the third element in the definition. (See, e.g., *Societa per Azioni de Navigazione Italia* v. *City of Los Angeles, supra,* 31 Cal.3d 446 at p. 458; *McDonald* v. *Shell Oil Co., supra.*)

There was thus evidence, or inferences reasonably to be drawn, which amounted to substantial evidence in support of a determination that Uniroyal employed Teledyne to manufacture UDMH as an independent contractor. The trial court erred in refusing to submit the independent contractor issue to the jury by giving the instruction appellants requested. (See *Courtell* v. *McEachen, supra,* 51 Cal.2d 448 at p. 456; *Stilson* v. *Moulton-Niguel Water Dist., supra,* 21 Cal.App.3d 928 at p. 936.)

*The Refusal to Instruct on
the Peculiar Risk Doctrine*

Appellants contend that the trial court committed reversible error in refusing the instructions requested on the peculiar risk doctrine (see the text at fn. 5, *ante*) because there was substantial evidence supporting an inference that the manufacture of the UDMH by Teledyne involved a "peculiar risk" within the meaning of the doctrine. We agree. The Supreme Court has defined "peculiar risk" in the Restatement's terms, as follows:

"A peculiar risk is a risk which is peculiar to the work to be done and arises out of its character or the place where it is to be done, and against which a reasonable person would recognize the necessity of taking special precautions. (Rest.2d Torts, §§ 413, com. b., 416, com. b.) It is something other than the ordinary and customary dangers which may arise in the course of the work or of normal human activity. ' "Peculiar" does not mean that the risk must be one which is abnormal to the type of work done, or that it must be an abnormally great risk. It has reference only to a *special, recognizable danger* arising out of the work itself.' (Rest.2d Torts, § 413, com. b.) 'It is not essential that the peculiar risk be one which will necessarily and inevitably arise in the course of the work, no matter how it is done. It is sufficient that it is a risk which the employer should recognize as likely to arise in the course of the ordinary and usual method of doing the work, or the particular method which the employer knows the contractor will adopt.' (Rest.2d Torts, § 416, com. e.)" (*Griesel* v. *Dart Industries, Inc., supra,* 23 Cal.3d 578 at p. 586 [quoted in part in *Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502 at p. 509; italics added here].)

"The determination of whether a danger is *recognizable* requires consideration of the employer's knowledge and experience in the field of work to

be done." (*Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502 at p. 509 [citing Rest.2d Torts, § 413, com. f; italics added here]; *Mackey* v. *Campbell Construction Co.* (1980) 101 Cal.App.3d 774, 784.) ". . . [T]he more extensive his knowledge and experience, the more applicable is the rule." (*Mackey* v. *Campbell Construction Co., supra,* [also citing Rest.2d Torts, § 413, com. f].)

The evidence relative to application of the peculiar risk doctrine is also to be viewed in the light most favorable to appellants. (See *Selinsky* v. *Olsen, supra,* 38 Cal.2d 102 at p. 103; *Fish* v. *Los Angeles Dodgers Baseball Club, supra,* 56 Cal.App.3d 620 at p. 634; *Christian* v. *Bolls, supra,* 7 Cal.App.3d 408 at pp. 415-416.) It is undisputed that DMA was an indispensable component of the nitrosation stage in the manufacture of UDMH, that DMA vapor was highly flammable, and that it should not in any circumstances be permitted to escape from a reactor. The plaintiffs' first expert testified concerning the danger of explosion and fire in the "handling" of DMA. Their second expert testified concerning the same danger, the fact that Teledyne was operating a "new . . . plant to produce UDMH" with an "untried process," and the necessity of using specified safety devices for these reasons.

The hazards involved in the manufacture of UDMH were in effect acknowledged in Teledyne's "Standard Operating Procedures." Testimony by James Dodgen and Frederick Dovell supported an inference that it was these hazards which prompted their concern for the safety of Teledyne's employees. Both men were experienced in the field of chemical engineering. Dodgen was experienced and knowledgeable in the manufacture of UDMH by reason of his service as a consultant to the Navy and the fact that he had previously seen at least three UDMH plants in operation. He unequivocally testified that he "knew more about the production of it than Teledyne did."

There was thus substantial evidence in support of a factual determination that the manufacture of UDMH involved a risk which was " 'peculiar to the work to be done' "; a " 'special, recognizable danger arising out of the work itself' "; and a risk which the employer of an independent contractor performing the work (Uniroyal in the present case, if the jury had so identified it pursuant to the instructions on the independent contractor issue which were requested but refused) " 'should recognize as likely to arise in the course of the ordinary and usual method of doing the work, or the particular method which the employer knows the contractor will adopt.' " (See *Griesel* v. *Dart Industries, Inc., supra,* 23 Cal.3d 578 at p. 586 [quoting Rest.2d Torts, § 413, com. b, and *id.,* § 416, com. e]; see also *Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502 at p. 509.) Whether work involved a "peculiar risk" is ordinarily a question of

fact. (*Ferrel* v. *Safway Steel Scaffolds* (1962) 57 Cal.2d 651, 656 [21 Cal.Rptr. 575, 371 P.2d 311]; *Mackey* v. *Campbell Construction Co., supra,* 101 Cal.App.3d 774 at p. 784.) ▆▆▆ In light of the substantial evidence mentioned, the trial court erred in refusing to instruct on the doctrine as requested.

▆▆▆ Uniroyal contends to the contrary on the ground that the "undisputed causes of the plaintiffs' injuries" included the failure of Teledyne's employees to follow the standard operating procedures, and that there was accordingly "collateral negligence," on Teledyne's part, which had the effect of exonerating Uniroyal from liability even if it had employed Teledyne as an independent contractor. The authority cited for this argument is section 426 of the Restatement, which defines the so-called "collateral negligence doctrine."[8]

For purposes of the peculiar risk doctrine, as previously shown, a "peculiar risk" is defined as "a risk which is peculiar to the work to be done and arises out of its character . . .," and as a " 'special, recognizable danger arising out of the work itself.' " (*Griesel* v. *Dart Industries, Inc., supra,* 23 Cal.3d 576 at p. 586 [citing and quoting Rest.2d Torts, § 413, com. b].) These definitions establish that a "peculiar risk" is one which is *inherent* in the work and *normal* to it. (See 4 Witkin, Summary, *op. cit. supra,* Torts, § 661, p. 2939.) Where that appears, section 426 of the Restatement is inapplicable according to its express terms. (See fn. 8, *ante.*) The question whether the risk shown in the present evidence was *inherent* in the manufacture of UDMH should have been resolved by the jury pursuant to instructions on the peculiar risk doctrine. The jurors might appropriately have been instructed on the collateral negligence doctrine when that question was submitted to them as an issue of fact. It obviously does not follow that the collateral negligence doctrine exonerates Uniroyal as a matter of law. Uniroyal's contention to that effect is rejected accordingly.

Uniroyal also argues that the peculiar risk doctrine should be strictly interpreted, or limited in its application, or both, where the party claiming liability in the employer of an independent contractor is an employee of the independent contractor in the conventional master-servant sense. The decisions cited for this point are *Stark* v. *Weeks Real Estate* (1979) 94 Cal.App.3d 965, 972 [156 Cal.Rptr. 701]; *Elder* v. *Pacific Tel. & Tel. Co.*

---

[8]Section 426 reads in pertinent part: ". . . [A]n employer of an independent contractor, unless he is himself negligent, is *not* liable for physical harm caused by the negligence of the contractor if [¶] (a) the contractor's negligence consists solely in [*sic*] the improper manner in which he does the work, *and* [¶] (b) it creates a risk of such harm which is *not inherent in or normal to the work,* and [¶] (c) the employer had no reason to contemplate the contractor's negligence when the contract was made." (Italics added.)

(1977) 66 Cal.App.3d 650, 659, 660-661 [136 Cal.Rptr. 203]; *Anderson* v. *Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235, 243 [125 Cal.Rptr. 640]; *Addison* v. *Susanville Lumber, Inc.* (1975) 47 Cal.App.3d 394, 402 [120 Cal.Rptr. 737]. The holdings cited in *Stark, Elder,* and *Addison* have been expressly distinguished on the ground that the peculiar risk doctrine was held inapplicable, in each case, on the basis of the respective appellate court's "conclusion that the risk was an ordinary one or one not related to any risk inherent in the particular work being performed." (*Mackey* v. *Campbell Construction Co., supra,* 101 Cal.App.3d 774 at pp. 787-788.) *Anderson* may be distinguished on that basis because the *Anderson* court principally relied on *Addison.* (See *Anderson* v. *Chancellor Western Oil Dev. Corp., supra,* at pp. 241-243.) It is settled that the peculiar risk doctrine may apply where (as in the present case) employees of an independent contractor invoke it against the contractor's employer. (*Aceves* v. *Regal Pale Brewing Co., supra,* 24 Cal.3d 502 at p. 509, fn. 1; *Mackey* v. *Campbell Construction Co., supra,* at p. 787, fn. 3.)

 Uniroyal also contends that it is "exempt" from liability pursuant to the peculiar risk doctrine, as a matter of law, because the "mechanical causes" of the accident were a defective valve and deluge system in the equipment owned and maintained by Teledyne. Uniroyal thus argues in effect that an employer of an independent contractor cannot be held liable to a third party, pursuant to the peculiar risk doctrine, for injuries which are attributable to defective equipment not controlled by the employer. This assertion cannot apply in the present case because of the evidence that the risks of defective equipment, and the consequent escape of flammable vapor, were "foreseeable" and "inherent" in the manufacture of UDMH. (See *Holman* v. *State of California* (1975) 53 Cal.App.3d 317, 328-332 [124 Cal.Rptr. 773].)

*The Effect of the Refusal
to Instruct as Requested*

The independent contractor issue, and an issue as to whether the peculiar risk doctrine applied in appellants' favor, were tendered in their amended pleading (see fn. 1, *ante*) and joined in Uniroyal's answer. The actions were tried on their theories that Uniroyal had employed Teledyne as an independent contractor, and that it was liable to appellants pursuant to the peculiar risk doctrine. The trial court gave general instructions on negligence in the abstract (e.g., BAJI Nos. 3.00 and 3.10). The jury's findings that Uniroyal was not "negligent" (see fn. 2 and the accompanying text, *ante*) were made in response to these instructions, none of which expressed appellants' theories of liability.

■ A litigant is entitled to instructions on any theory for which there is support in the record. (*Truman* v. *Thomas* (1980) 27 Cal.3d 285, 295 [165 Cal.Rptr. 308, 611 P.2d 902]; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 10 [116 Cal.Rptr. 575]; 4 Witkin, Procedure, *op. cit. supra,* Trial, § 192, p. 3012.) Appellants were entitled to have the jury instructed on their specific theories of the case rather than in abstract generalities. (*Borenkraut* v. *Whitten* (1961) 56 Cal.2d 538, 545-546 [15 Cal.Rptr. 635, 364 P.2d 467]; *Self* v. *General Motors Corp., supra.*) ■ The error in the refusal of the instructions they requested was not cured or rendered harmless by the general instructions or the jury's findings. If the jury had been given the requested instructions, and had found in appellants' favor on the two theories, the findings would have had support in the record. We are therefore required to reverse the judgment. (Cal. Const., art. VI, § 13; *Truman* v. *Thomas, supra; Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 808 [13 Cal.Rptr. 401]; see also *Fish* v. *Los Angeles Dodgers Baseball Club, supra,* 56 Cal.App.3d 620 at pp. 633-634, 641-642.)

## II. *The Instructions on a "Voluntary Undertaking"*

■ Appellants further contend that the trial court erroneously refused to give instructions they requested on liability for negligence in the performance of a "voluntary undertaking," and that instructions actually given on the subject were erroneous. This contention involves the so-called "Good Samaritan rule," which is stated in BAJI No. 4.45 as follows: "One who is under no duty to care for or render service to another but who voluntarily assumes such duty, is subject to liability to the other for injury proximately caused by a failure to exercise ordinary or reasonable care in the performance of such assumed duty."

■ BAJI No. 4.45 accurately states the law. (See *Coffee* v. *McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 557 [105 Cal.Rptr. 358, 503 P.2d 1366] [text and fn. 6]; *Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 238 [60 Cal.Rptr. 510, 430 P.2d 68]; 4 Witkin, Summary, *op. cit. supra,* Torts, § 557, pp. 2823-2824; Rest.2d, Torts, § 323.)[9] ■ This instruction, or its equivalent, was warranted in the present case by the testimony of Dodgen and Dovell to the effect that they voluntarily prepared and presented the written "list of changes" (see fn. 4, *ante*) in the interests

---

[9]Section 323 of the Restatement reads as follows: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if [¶] (a) his failure to exercise such care increases the risk of harm, or [¶] (b) the harm is suffered because of the other's reliance on the undertaking."

of employee safety, and by Allen's testimony that the "job" was "closed down for two weeks" while Teledyne made the changes in reliance on the list. In light of the evidence of Dodgen's and Dovell's expertise in the processes involved, and their stated concerns for employee safety, the jury could reasonably have determined that they—and Uniroyal through them— were negligent in failing to communicate to Teledyne, or to perceive, the need for the safety devices which the plaintiffs' expert described and with which the UDMH facility was not equipped.

Both sides acknowledged the evidentiary support for BAJI No. 4.45 or its equivalent. Appellants requested that it be given verbatim. They also requested an ancillary instruction which read: "While one may be under no contractual duty to control the conduct of another, if one does exercise such control, he must use care in doing so." Uniroyal requested an instruction which included a modified version of section 323 of the Restatement (see fn. 9, *ante*) and three qualifying sentences.[10] The trial court refused to give BAJI No. 4.45, or the version of Restatement section 323 requested by Uniroyal, but gave appellants' ancillary instruction and two of Uniroyal's three qualifying sentences. (See fn. 10.) The only instructions given on liability for the negligent performance of a voluntary undertaking were thus stated to the jury as follows:

"While one may be under no contractual duty to control the conduct of another, if one does exercise such control, he must use care in doing so. The mere offering of suggestions as to certain parts of an operation does not create a general duty of supervision. The scope of a volunteer's duty of care is limited by the scope of his undertaking."

The instructions requested on this subject referred to liability proximately caused by breach of a duty of care which is assumed when services are rendered "voluntarily," all of which are elements of the Good Samaritan rule. (See BAJI No. 4.45, quoted *supra*; Rest.2d Torts, § 323; quoted in fn. 9, *ante*.) The instructions given did not state them. They were omitted because the court gave trailing passages without giving either of the substantive instructions they were designed to trail. The results were statements supplementing or qualifying a rule of law without a complete or intelligible statement of the rule itself.

---

[10]The full text of the instruction requested by Uniroyal read as follows: "One who voluntarily undertakes to render services to another must exercise reasonable care in performing his undertaking. He may be subject to liability only if his failure to exercise such care increases the risk of physical harm or such harm is suffered because of the other's reliance on the undertaking. [¶] The mere offering of suggestions as to certain parts of an operation does not create a general duty of supervision. The scope of a volunteer's duty of care is limited to the scope of his undertaking. A volunteer may limit his involvement or terminate it at any time or for any reason."

The rule not stated to the jury was an alternative theory of liability in Uniroyal which appellants pleaded and tried, and on which they introduced substantial evidence. Its omission from the instructions was accordingly error. (*Truman* v. *Thomas, supra,* 27 Cal.3d 285 at p. 295; *Self* v. *General Motors Corp., supra,* 42 Cal.App.3d 1 at p. 10; 4 Witkin, Procedure, *op. cit. supra,* Trial, § 192, p. 3012.) Again, the error was not cured or rendered harmless by the general instructions on negligence or by the jury's findings. (See *Borenkraut* v. *Whitten, supra,* 56 Cal.3d 538 at pp. 545-546; *Self* v. *General Motors Corp., supra.*) If BAJI No. 4.45 had been given as appellants requested, and the jury had found in their favor on the theory expressed in it, the finding would have had support in the record. Its refusal was therefore reversible error. (Cal. Const., art. VI, § 13; *Truman* v. *Thomas, supra; Phillips* v. *G. L. Truman Excavation Co., supra,* 55 Cal.2d 801 at p. 808.)

The judgments are reversed.

Caldecott, P. J., and Poché, J., concurred.