[No. E012904. Fourth Dist., Div. Two. June 23, 1995.]

GEORGE BOSTROM, an Incompetent Person, etc., et al., Plaintiffs and Appellants, v.
COUNTY OF SAN BERNARDINO, Defendant and Respondent.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV and VI.

COUNSEL

De Goff & Sherman, Victoria J. De Goff, Richard Sherman, Walkup, Melodia, Kelly & Echeverria, John Echeverria and Daniel Dell'Osso for Plaintiffs and Appellants.

MacLachlan, Burford & Arias, Christopher D. Lockwood and Sharon K. Burchett for Defendant and Respondent.

**OPINION**

**RICHLI, J.**—George Bostrom was severely injured when the small plane he was piloting crashed on takeoff from Chino Airport. The County of San Bernardino (the County) owns Chino Airport. The County leased land at the airport to Cal West Aviation for the purpose of providing jet fueling and other services. The crash occurred because an employee of Cal West Aviation fueled the plane with jet fuel instead of ordinary aviation gas.

In this action, Mr. Bostrom and his wife, Susan Bostrom (collectively the Bostroms), seek to hold the County liable for the injuries resulting from the crash. The trial court, however, granted summary judgment for the County,

essentially on the ground that the Bostroms were unable to introduce sufficient evidence of any cause of action that would be within any statutory exception to the general rule of sovereign immunity. On appeal, the Bostroms contend that they raised a triable issue of fact as to whether the County was liable under five distinct legal theories, each of which came within some exception to the rule of immunity. We disagree, and we will affirm.

## I.

### FACTUAL BACKGROUND

The following facts are taken from the papers filed in support of and in opposition to the County's motion for summary judgment. Consistent with the applicable standard of review (see pt. III, *post*), we view the evidence in the light most favorable to the Bostroms as plaintiffs.

It is undisputed that on September 14, 1987, Mr. Bostrom was flying a Piper Aerostar which crashed when both engines failed on takeoff. The crash occurred because, while the plane was on the ground at Chino Airport, an employee of Cal West Aviation misfueled it with jet fuel instead of aviation gas. Mr. Bostrom survived; plaintiffs, however, allege that he sustained severe and permanent injuries.

The Piper had reciprocating engines, which use pistons. Airplanes with piston engines run on aviation gas—"avgas" for short—which is similar to gasoline. By contrast, jet engines use turbines and run on jet fuel, which is similar to diesel fuel. Putting jet fuel into a plane with a piston engine will cause the engine to fail and the plane to crash, usually shortly after takeoff.

On August 27, 1982, the Federal Aviation Administration (FAA) had issued an advisory circular entitled "Aircraft Fuel Storage, Handling and Dispensing on Airports." The advisory circular represented a guideline, not a regulation or law. It stated that "[a] written SOP [standard operating procedure] for aircraft fuel from facilities on the particular airport shall be available in the airport manager's office and in each fueling truck." It proposed a "typical fueling procedure," in which the fueling supervisor would "obtain quantity and grades of products required from airline or aircraft personnel." It also proposed "minimum standards" to serve as "a guide" for an airport's preparation of its own standards for fuel dispensing. The proposed standards provided that both fueling supervisors and "line" fueling personnel should:

"(1) Be able to identify, explain major characteristics of, and distinguish between, the various types of fuel (using flammability, color, odor, and feel) found on the airport;

"(2) Be able to distinguish gasoline fueled reciprocating engines from turbine engines and explain the major features of each, and describe the type of fuels and oils used by each . . . ."

The FAA's proposed standards required that hoses be "[e]quipped with appropriate unique fuel couplings for each product . . . ." In December 1984, the Society of Automotive Engineers (SAE) had issued Aerospace Standard 1852, which prescribed different fuel port dimensions for piston engine and for jet aircraft. It also prescribed the dimensions of an elongated nozzle to be used for pumping jet fuel. Compliance with this standard would make it impossible to put jet fuel into a piston engine plane. Piper had sent out a service bulletin requiring its planes to be retrofitted with fuel port restrictors consistent with this standard.

Finally, in addition to the advisory circular, the FAA had also issued a recommendation that the fuel ports on piston engine planes be labeled to indicate the type of fuel required.

The County owns and operates Chino Airport. The County's goal for the airport was to develop it into the largest general aviation airport in Southern California, and the County's most revenue-producing airport. The County particularly wanted the airport to be attractive to corporate jet traffic. To accomplish this, the airport had to make jet fueling service available.

The County had adopted an "Airports Ordinance" governing public airports owned by the County. The ordinance provided, to the extent pertinent here, that the County Chief of Aviation "shall have the authority, and is charged with the responsibility, to administer and enforce the provisions of this title . . . ." It also provided that: "All regulations and recommendations of . . . the Federal Aviation Administration shall be adhered to with regard to all aspects of fueling . . . ."

The County had entered into an agreement with Chino Jet, Inc. (CJI) by which the County leased space at Chino Airport to CJI as a fixed base operator (FBO).[1] The agreement gave CJI various rights, including the exclusive right to sell jet fuel and the exclusive right to put in an avgas station at the airport, as well as rights to run charter flights, do pilot training, sell aircraft, modify or repair aircraft, and store or tether aircraft.

In 1985, the County decided to terminate its agreement with CJI. However, it needed to keep jet fuel available at the airport. Indeed, it was very

---

[1]The County defined an FBO as "a person who, under contract with the County . . . , engages in the business of aeronautics, aircraft repairs of all kinds, sale and renting of new and used aircraft, sale of parts, flight instruction, commercial flying clubs, airplane charter trips, or local short flights."

concerned about having jet fuel available for an upcoming air show. Thus, it sought someone to take over CJI's lease. When one John Hope learned of this, he told County officials he was interested in taking over the lease.[2] Mr. Hope had no previous experience in aviation. He had never operated as an FBO before. He had never sold either jet fuel or avgas. He knew nothing about refueling airplanes. County officials became aware that Mr. Hope lacked experience as an FBO, but he told them not to worry because he would hire qualified people.

On May 12, 1986, the County entered into a written agreement by which it leased land at Chino Airport to Mr. Hope and Mr. Hope's corporation, JMI, Inc., doing business as Cal West Aviation (hereafter collectively Cal West). A major reason for the County's approval of the agreement was that it would "provide for continual jet fuel availability and servicing to aircraft at Chino Airport."

The agreement stated, "This lease is limited to the purpose of FAA approved basic and advanced flight training, FAA approved aircraft maintenance, service and avionics repair and instruments, retail sales of aviation fuel, retail jet fuel sales, rental of aircraft tie downs space, rental of aircraft and automobiles, charter flights, air taxi service, and wholesale and retail sale of aircraft." Cal West covenanted to "operate and conduct . . . those business activities," "continuously and uninterruptedly," "during normal business hours." Cal West could not use the premises for any other purpose without the County's permission.

In addition to fixed monthly rent, Cal West was to pay the County 2 percent of Cal West's gross revenues, 5 cents per gallon of jet fuel received, 5 cents per gallon of aviation fuel received, 25 cents per gallon of aviation oil received, 1 percent of gross sales of aircraft owned by Cal West, and 3 percent of brokerage commissions on sales of aircraft not owned by Cal West.

Cal West covenanted "to conform to all applicable Federal, State and County Rules and Regulations." Cal West was to maintain insurance, including comprehensive general liability insurance naming the County as an additional insured, and to hold the County harmless against claims for personal injury or property damage "caused by or contributed to by any act or omission of the [tenants] in the use of the premises . . . ." The County reserved the right to enter the premises "for the purpose of inspecting the

---

[2]The County disputed this. It introduced evidence that Mr. Hope acquired a controlling interest in CJI, then asked the County to terminate its agreement with CJI and enter into a new agreement with him.

leased property for conformance to lease provisions." Finally, in lease provisions required by the FAA, Cal West agreed not to discriminate based on race, creed, color, national origin, or sex, and additionally agreed to "furnish . . . accommodations and/or services on a fair, equal and not unjustly discriminatory basis to all users thereof . . . ."

When Cal West first took over the FBO, it had no employees. At the County's suggestion, it hired two former CJI employees. They showed Mr. Hope how to refuel. Cal West sold jet fuel only. A different FBO at the airport sold avgas. Mr. Hope learned to tell that an airplane could not use jet fuel from a ring around the fuel port stating "avgas only." He never learned that jet fuel and avgas are different colors, and he never learned that avgas has an octane rating.[3] He was unaware of the SAE standard prescribing elongated jet fuel nozzles.

In June 1987, Cal West hired Mary Kathleen Asbury as a jet refueler. For about two and a half years, from 1982 to 1984, she had refueled jets part time as a member of the Air National Guard. March Air Force Base, however, where she was stationed, did not use either piston engine planes or hoses with nozzles. Thus, Ms. Asbury had had no training on the difference between piston engine and turbine powered aircraft, or on the meaning of the labels on the fuel ports of piston engine planes. Mr. Hope showed Ms. Asbury how to use the refueling truck. Otherwise, neither Cal West nor the County provided Ms. Asbury with any training.

Chino Airport had no safety officer and no refueling standard operating procedure or manual. In general, the County took no affirmative steps to verify that an FBO was in compliance with its lease; it assumed that it was, unless there was a complaint or a visible breach. The County conducted no inspections to determine whether Cal West had proper equipment or trained personnel. The County never asked to see Cal West's records concerning the training of its refuelers.

Cal West had only one working fuel truck. Although this truck was used exclusively for jet fuel, it lacked the prescribed elongated nozzle.

At some point, a representative of the County told Mr. Hope it had had to take Cal West's truck and fuel a plane because no one from Cal West had been around. The County took the position that this had been a violation of Cal West's lease.

On September 14, 1987, a customer asked Ms. Asbury to refuel both a jet and the Piper. She asked if anybody would be there to sign for the refueling.

---

[3]The Bostroms claim jet fuel has no octane rating. Although we find no evidence in the record to support this, we assume for purposes of our decision that it is true.

The customer said no, he was going to lunch. He also insisted that she use one refueling slip for both aircraft. For these reasons, she refused to refuel the planes. When Mike Merry (or Merrey, or perhaps Merri), the Chino Airport manager at the time, learned of this, he phoned Mr. Hope. Mr. Merry told Mr. Hope that if Cal West did not refuel the Piper, it would be in breach of its obligation under the lease to provide fuel as needed. Mr. Hope phoned Ms. Asbury and told her "to fill it up."

The Piper had the recommended restrictors on all of its fuel ports. Each of its fuel ports was duly labeled as being for 100/130 octane fuel. Moreover, as Ms. Asbury noticed, the Piper had a propeller.[4] Nevertheless, Ms. Asbury pumped jet fuel into the Piper.

## II.

### PROCEDURAL BACKGROUND

The Bostroms commenced this action on July 29, 1988. The original complaint named a number of defendants; on April 17, 1992, however, the Bostroms filed a request for dismissal as to all defendants except the County.

On January 21, 1993, the County filed a motion for summary judgment. The County argued that the Bostroms' complaint failed to state a cause of action under any of the statutory exceptions to the general rule of sovereign immunity. In the alternative, however, the County noted that, at least according to one of the Bostroms' interrogatory responses, the Bostroms intended to rely on the "dangerous condition of public property" exception to sovereign immunity (Gov. Code, § 835). The County argued that the evidence failed to show any such dangerous condition. Finally, the County also argued that it was entitled to "discretionary act" immunity. (Gov. Code, §§ 815.2, subd. (b), 820.2.)

On March 15, 1993, the Bostroms filed their opposition to the motion for summary judgment. They argued that their complaint stated sufficient facts to bring their cause of action within both the "mandatory duty" exception (Gov. Code, § 815.6) and the "independent contractor" exception (Gov. Code, § 815.4). They also argued that they had raised three distinct theories of liability, each within the "respondeat superior" exception (Gov. Code, §§ 815.2, subd. (a), 820, subd. (a)): first, negligent hiring of an independent contractor; second, negligent exercise of control over an independent contractor; and third, failure to protect the public against unreasonably dangerous activities of an independent contractor or concessionaire.

---

[4]Apparently some jets have propellers.

On March 31, 1993, the County filed reply papers. It argued that the Bostroms' complaint had failed to allege any of the theories of liability on which they now purported to rely. The County also argued that the mandatory duty exception did not apply, because the evidence failed to show that the County had breached any mandatory duty imposed by an enactment; the independent contractor exception did not apply, because the evidence failed to show that Cal West was the County's independent contractor rather than its lessee; and the Bostroms' negligence theories did not apply, again because Cal West was not the County's independent contractor.

On April 21, 1993, the trial court issued a written ruling granting the motion. It held that the mandatory duty exception did not apply, because the Airport Ordinance did not impose a mandatory duty; the independent contractor exception did not apply, because the evidence failed to show that Cal West was an independent contractor rather than a lessee; and the respondeat superior exception did not apply, because the County's employees were entitled to discretionary act immunity.

On May 3, 1993, the trial court entered an order for entry of summary judgment and a judgment pursuant thereto. On June 4, 1993, the Bostroms filed a timely notice of appeal.

### III.

#### STANDARD OF REVIEW

"Review of a summary judgment motion by an appellate court involves application of the same three-step process required of the trial court. [Citation.] 'First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.] [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of [a] triable, material factual issue. [Citation.]' [Citation.]

". . . . . . . . . . . . . . . . . . . . . . . .

"Where a complaint does not state a cognizable claim, it is not necessary to proceed to the second step, since a defendant has no obligation to present

evidence to negate a legally inadequate claim. '[A] *defendant's* motion for summary judgment "necessarily includes a test of the sufficiency of the complaint . . . ." Motions for summary judgment in such suitations [*sic*] have otherwise been allowed as being in legal effect motions for judgment on the pleadings. [Citations.]' [Citation.] ' "Thus, if the reviewing court finds the complaint fails to state facts sufficient to constitute a cause of action as a matter of law, it need not reach the question whether plaintiff's opposition to the summary judgment motion raises a triable issue of fact." ' [Citation.]" (*Hansra v. Superior Court* (1992) 7 Cal.App.4th 630, 638-639 [9 Cal.Rptr.2d 216].)

However, if summary judgment is granted on the ground that the complaint is legally insufficient, but it appears from the materials submitted in opposition to the motion that the plaintiff could state a cause of action, the trial court should give the plaintiff an opportunity to amend the complaint before entry of judgment. (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719, fn. 5 [34 Cal.Rptr.2d 898, 882 P.2d 894]; *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1067-1070 [14 Cal.Rptr.2d 604]; *Williams v. Braslow* (1986) 179 Cal.App.3d 762, 774 [224 Cal.Rptr. 895].)

Even where the complaint does present a cognizable claim, so that the court proceeds to the second or third step, the pleadings remain significant. Summary judgment cannot be granted on a ground not raised by the pleadings. (*Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 885 [164 Cal.Rptr. 510, 610 P.2d 407], revd. on other grounds (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882].) Conversely, summary judgment cannot be *denied* on a ground not raised by the pleadings. (*Lewinter v. Genmar Industries, Inc.* (1994) 26 Cal.App.4th 1214, 1223 [32 Cal.Rptr.2d 305] [complaint alleged failure to warn of manufacturing defect in boat; plaintiff could not avoid summary judgment by showing failure to warn based on postmanufacture discovery of defect]; *Danieley v. Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 119-120 [266 Cal.Rptr. 749] [complaint alleged owner negligently maintained ski slopes; plaintiff could not avoid summary judgment by showing owner negligently cared for her after accident]; *Cochran v. Linn* (1984) 159 Cal.App.3d 245, 250 [205 Cal.Rptr. 550] [complaint alleged products liability based on manufacture and sale of liquid protein diet; plaintiffs could not avoid summary judgment by showing defendant negligently wrote book promoting diet]; see generally, *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381-382 [282 Cal.Rptr. 508].)

If either party wishes the trial court to consider a previously unpleaded issue in connection with a motion for summary judgment, it may request

leave to amend. (*Lee* v. *Bank of America* (1994) 27 Cal.App.4th 197, 216 [32 Cal.Rptr.2d 388]; *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 611 [163 Cal.Rptr. 477].) Such requests are routinely and liberally granted. However, " ' "[I]n the absence of some request for amendment there is no occasion to inquire about possible issues not raised by the pleadings." ' " (*Metromedia, Inc.* v. *City of San Diego, supra,* 26 Cal.3d at p. 885, quoting *Krupp* v. *Mullen* (1953) 120 Cal.App.2d 53, 57 [260 P.2d 629].) Declarations in opposition to a motion for summary judgment "are no substitute for amended pleadings." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065 [225 Cal.Rptr. 203].) If the motion for summary judgment presents evidence sufficient to disprove the plaintiff's claims, as opposed to merely attacking the sufficiency of the complaint, the plaintiff forfeits an opportunity to amend to state new claims by failing to request it. (See *Kirby* v. *Albert D. Seeno Construction Co., supra,* 11 Cal.App.4th at p. 1068.)

Here, the County argues that the Bostroms' complaint failed to allege any of the theories of liability urged below in opposition to the motion for summary judgment. We are inclined to agree. The trial court, however, did not rest its grant of summary judgment on this ground. Had it done so, the Bostroms would have been entitled to seek leave to amend their complaint before entry of judgment so as to allege these omitted theories.[5] Instead, the trial court reached the merits.

If we were to hold that the complaint failed to state any viable cause of action, we would have discretion (and might even be required) to remand with directions to permit the Bostroms to move for leave to amend. (See *Williams* v. *Braslow, supra,* 179 Cal.App.3d at p. 774.) The net result could well be a new complaint and a new motion for summary judgment, followed by a new appeal, which we would have to decide on the merits. We therefore choose not to resolve the appeal on this basis.

Instead, we look to whether the Bostroms raised a triable issue of fact as to whether the County was liable on any of the theories they asserted in opposition to the County's motion for summary judgment. If not, then summary judgment without leave to amend was properly granted regardless of whether these theories were pleaded or unpleaded.

---

[5]Given the trial court's discretion in ruling on a motion for leave to amend, plus the fact that the Bostroms had waited until virtually the eve of trial before unveiling their new theories, we express no opinion as to whether such a motion for leave to amend would have had to be granted.

## IV.

## MANDATORY DUTY UNDER THE AIRPORT ORDINANCE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V.

## VICARIOUS LIABILITY FOR THE TORT OF AN INDEPENDENT CONTRACTOR

The Bostroms contend that Cal West was the County's independent contractor, and therefore that the County could be held vicariously liable for Cal West's negligence under the "independent contractor" exception to sovereign immunity. This exception provides, in pertinent part, that: "A public entity is liable for injury proximately caused by a tortious act or omission of an independent contractor of the public entity to the same extent that the public entity would be subject to such liability if it were a private person." (Gov. Code, § 815.4.) The Bostroms argue that if the County were a private person, it could be held vicariously liable for the negligence of Cal West as its independent contractor under either the "peculiar risk" doctrine (see generally, *Privette* v. *Superior Court* (1993) 5 Cal.4th 689, 693-696 [21 Cal.Rptr.2d 72, 854 P.2d 721]; Rest.2d Torts, §§ 413, 416) or the "nondelegable duty" doctrine (see generally, *Maloney* v. *Rath* (1968) 69 Cal.2d 442, 446-448 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1]; Rest.2d Torts, §§ 423, 424).

The independent contractor exception applies, by definition, only to the tort "of an independent contractor of the public entity." (*Stanford* v. *City of Ontario* (1972) 6 Cal.3d 870, 879 [101 Cal.Rptr. 97, 495 P.2d 425]; *Shields* v. *County of San Diego* (1984) 155 Cal.App.3d 103, 113 [202 Cal.Rptr. 30].)[10] The County therefore argues that Cal West was the County's lessee, and not its independent contractor.

Cases on how to distinguish an independent contractor from an employee or agent are legion, because it is the general rule (although subject to numerous exceptions) that an employer can be held vicariously liable for torts of its employee, but not for torts of an independent contractor. (*Millsap*

---

*See footnote, *ante*, page 1654.
[10]We therefore are not called upon to decide, as a matter of general tort law, whether either the peculiar risk doctrine or the doctrine of nondelegable duty could make a lessor vicariously liable for the torts of its lessee.

v. *Federal Express Corp.* (1991) 227 Cal.App.3d 425, 430 [277 Cal.Rptr. 807].) There is a relative dearth of authority on how to distinguish an independent contractor from one who is *neither* an independent contractor *nor* an employee.[11] In fact, we have found only two helpful California cases: *Stanford* v. *City of Ontario, supra,* 6 Cal.3d 870, and *White* v. *Uniroyal, Inc.* (1984) 155 Cal.App.3d 1 [202 Cal.Rptr. 141], disapproved on other grounds, *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 574-575, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].

In *Stanford,* a homeowner hired Tennison Cesspool and Sewer Co. (Tennison) to connect her plumbing to the public sewer owned by the City of Ontario (City). A permit was required for this work, and the City issued such a permit to Tennison. (6 Cal.3d at p. 874.) While construction was under way, the walls of an improperly sloped and shored trench collapsed onto a workman, injuring him. (*Id.,* at p. 875.) The workman sued the City, claiming, among other things, that the City had contracted with Tennison for the construction. At the close of the plaintiff's case, however, the trial court granted a nonsuit. (*Id.,* at p. 875.)

On appeal, the plaintiff argued that the City could be held liable under the independent contractor exception. (6 Cal.3d at p. 876.) He argued that "despite the fact that the City did not formally employ Tennison, nevertheless it should be found to have effectively employed Tennison through the form of a permit since the City owned the street and the sewer to be constructed, required indemnity from Tennison as to all liability arising from personal injuries sustained as a result of Tennison's tortious conduct in completing the excavation, specified the standards of construction and safety, and reserved the right to inspect and the right to halt construction until satisfied that all requirements were being met by Tennison." (*Id.,* at p. 879.) The Supreme Court disagreed, finding that "all of the factors just mentioned are entirely consistent with the relationship which in fact existed between the City as the permit-issuing authority and Tennison, as the permittee." (*Ibid.*)

In *White,* defendant Uniroyal made an agricultural chemical called Alar. Among the raw materials it needed to make Alar was a predecessor chemical, "UDMH." Suddenly, Uniroyal's usual supplier of UDMH stopped

---

[11] In cases where the issue is whether a defendant is vicariously liable because the tortfeasor was the defendant's employee, any statement that the tortfeasor was an "independent contractor" means merely that the tortfeasor was *not* an employee. Beyond that, it is, for our purposes, dictum. Such cases afford no useful authority in deciding whether a tortfeasor is an independent contractor as opposed to a lessee or something else.

making it. (155 Cal.App.3d at p. 12.) No one else was manufacturing UDMH commercially. (*Id.*, at p. 14.) Uniroyal, casting about for a new supplier, contacted Teledyne. Teledyne had patented a process for UDMH production, but had never actually produced UDMH commercially. (*Id.*, at p. 12.) In order to do so, Teledyne had to build a new manufacturing facility. Even before a contract was signed, Uniroyal authorized Teledyne to make commitments for materials and for construction of the new facility. (*Id.*, at p. 14.) During the negotiations, Teledyne disclosed proprietary data about its manufacturing process to Uniroyal, subject to a confidentiality agreement. (*Id.*, at p. 13.)

Uniroyal then entered into a contract to buy UDMH from Teledyne. (155 Cal.App.3d at pp. 11, 13-14.) The contract price for the first year of operation was to be higher than in succeeding years to reimburse Teledyne for the nonrecurring cost of the new facility. (*Id.*, at pp. 13-15.) The contract required the UDMH to be manufactured in compliance with Uniroyal's specifications. (*Id.*, at pp. 13-14.) Uniroyal representatives visited the site and observed Teledyne's preparations, in part to ensure compliance with Uniroyal's specifications. (*Id.*, at pp. 15-17.) At one point, the Uniroyal representatives expressed concern about safety at the new facility. They gave Teledyne a list of changes they wanted made. (*Id.*, at pp. 16-18.) Teledyne made these changes, and production began. (*Id.*, at p. 18.)

Not long afterward, a highly inflammable chemical used in the process exploded, killing one worker and injuring three others. (155 Cal.App.3d at pp. 19-20.) There was evidence that safety devices and procedures existed that could have prevented either the explosion or the resulting injuries. (*Id.*, at pp. 21-22.) After a trial in which these facts were shown, however, the jury found that Uniroyal was not negligent. (*Id.*, at pp. 10-11.)

On appeal, the injured workers claimed that the trial court had erred by refusing to instruct on the peculiar risk doctrine. (155 Cal.App.3d at p. 22.) The appellate court considered as a threshold issue whether the trial court had erred in refusing to give an instruction defining "independent contractor" (*id.*, at pp. 23-24), on the grounds that "only a vendor-purchaser relationship existed between Teledyne and Uniroyal." (*Id.*, at p. 25.)

The court began by noting that "[a]n 'independent contractor' is generally defined as a person who is employed by another to perform work; who pursues an 'independent employment or occupation' in performing it; and who follows the employer's 'desires only as to the results of the work, and not as to the means whereby it is to be accomplished.' [Citations.] The most

significant factor in determining the existence of an employer-independent contractor relationship is the right to control the manner and means by which the work is to be performed. [Citations.] 'If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established. [Citation.]' [Citation.]" (155 Cal.App.3d at pp. 24-25.)

The court held that "[a] vendor-purchaser relationship and an employer-independent contractor relationship are . . . not mutually exclusive as a matter of law." (155 Cal.App.3d at p. 27.) It then found that "the foregoing facts are not characteristic of the conventional vendor-purchaser relationship between the parties to a mere 'contract for the sale of goods.' The totality of these facts supports inferences that the relationship between Teledyne and Uniroyal was far more; that Uniroyal sought out and employed Teledyne to manufacture UDMH, not merely to sell it; and that Uniroyal employed Teledyne to 'render services,' or to 'perform work,' within the meaning of the first element of the definition of an 'independent contractor' . . . . [Citations.]

"It is undisputed that Teledyne was engaged in an independent chemical business during its manufacture of the UDMH. This fact established the second element of the definition of an 'independent contractor.' [Citations.] There was evidence . . . that Teledyne controlled the manufacturing process, or had the right to control it, within the meaning of the third element in the definition. [Citations.] [¶] There was thus . . . substantial evidence in support of a determination that Uniroyal employed Teledyne to manufacture UDMH as an independent contractor." (155 Cal.App.3d at pp. 28-29.)

The Bostroms argue that a lessor-lessee relationship and an employer-independent contractor relationship are not mutually exclusive. *White* suggests as much. In addition, there are cases holding that a lessor-lessee relationship may also be a principal-agent or an employer-employee relationship. (*Tomlin* v. *California Emp. Com.* (1947) 30 Cal.2d 118, 123 [180 P.2d 342] [lessees of arcade machines were lessor's employees]; *Dorsic* v. *Kurtin* (1971) 19 Cal.App.3d 226, 238-239 [96 Cal.Rptr. 528] [lessee of gas station was lessor's agent].) We therefore presume that a lease *could* give rise to an employer-independent contractor relationship. It remains the Bostroms' burden, however, to prove that this particular lease *did* do so. Pursuant to *Stanford* and *White*, we look to whether the facts are consistent with a typical lessor-lessee relationship, or whether, on the other hand, they show the hallmarks of an employer-independent contractor relationship—that (1) the County hired Cal West to perform work, and (2) the County exercised

control or had a right of control over the result of the work[12]—to an extent inconsistent with a lessor-lessee relationship.

The agreement between the County and Cal West was entitled "Airport Lease Agreement." It contained conventional lease terms concerning the property conveyed, the rent due, the security deposit, maintenance, taxes, utilities, condemnation, holding over, and the like. While we recognize that the parties' own characterization of their relationship is not controlling, the agreement is at least evidence of a typical lessor-lessee relationship.

The Bostroms point out that the County wanted and needed to have jet fueling services available at the airport. The agreement between the County and Cal West stated that it was for "the purpose of FAA approved basic and advanced flight training, FAA approved aircraft maintenance, service and avionics repair and instruments, retail sales of aviation fuel, *retail jet fuel sales*, rental of aircraft tie downs space, rental of aircraft and automobiles, charter flights, air taxi service, and wholesale and retail sale of aircraft"; it required Cal West to "conduct . . . those business activities" continuously during normal business hours, and prohibited Cal West from using the premises for any other purposes. (Italics added.) The County approved the agreement largely because it would "provide for continual jet fuel availability and servicing to aircraft at Chino Airport."

These facts, however, in no way distinguish the agreement here from the typical modern commercial lease—particularly in multitenant retail premises, such as a mall. A mall owner may want to ensure that particular goods or services will be available at the mall in order to make it attractive to customers. For example, the owner will want a couple of department stores to attract customers to the ends of the mall, and a cluster of fast food vendors to serve as a food court. The County's desire to have jet fueling service available at the airport was consistent with such a lessor-lessee relationship.

It is significant that Cal West made its money from its customers, not from the County. Cal West then paid the County rent. There is no indication that the County lowered its standard rent, or gave Cal West any other monetary compensation, directly or indirectly, for providing jet fueling and

[12]In *White*, the court also suggested that the fact that Teledyne was engaged in an independent chemical business indicated that it was an independent contractor. (155 Cal.App.3d at p. 28.) This factor is significant in distinguishing an independent contractor from an employee, who normally is engaged in the employer's business. We find it unhelpful, however, in distinguishing an independent contractor from a pure lessee; either one normally will be engaged in an independent business.

other services. The Bostroms concede that "the County's primary, if not only, concern regarding a prospective FBO was the person's financial condition and ability to make the lease payments . . . ." Moreover, like its predecessor CJI, Cal West was to provide not only jet fueling but also a wide variety of other services. These facts are more consistent with a lessor-lessee relationship than with an employer-independent contractor relationship.

A provision for rent based on a percentage of the lessee's gross receipts is standard in mall and other retail leases. (See *College Block* v. *Atlantic Richfield Co.* (1988) 206 Cal.App.3d 1376, 1380 [254 Cal.Rptr. 179]; *Western Medical Enterprises, Inc.* v. *Albers* (1985) 166 Cal.App.3d 383, 390 [212 Cal.Rptr. 434]; 6 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) § 18:66, pp. 145-147 [hereafter Miller & Starr]; Dean et al., Commercial Real Property Lease Practice (Cont.Ed.Bar 1976) § 3.36, pp. 84-86 [hereafter CEB].) Indeed, the Bostroms expressly disavow any reliance on the percentage rent clause of the agreement here as an indicia of an employer-independent contractor relationship.[13]

Given a percentage rent clause, however, it is in the lessor's interest to maximize each lessee's revenue, while minimizing competition between different lessees. Thus, a commercial lease usually will require the lessee to operate continuously during specified business hours. (See CEB, *supra*, § 3.60, pp. 107-109.) Moreover, a commercial lease commonly will specify the business the lessee is to engage in, and will prohibit the lessee from engaging in any other business. (Miller & Starr, *supra*, § 18:98, at pp. 246-247; CEB, *supra*, § 3.58, pp. 104-105.) Even if a lease does not expressly include a covenant of continuous operation and/or a covenant restricting use of the premises to a particular purpose, the very fact that the lease provides for percentage rent may mean that such covenants must be implied. (*College Block* v. *Atlantic Richfield Co.*, *supra*, 206 Cal.App.3d at p. 1380; Miller & Starr, *supra*, § 18:45, pp. 95-98, § 18:98, p. 246.) The inclusion of such covenants in the agreement here was consistent with a lessor-lessee relationship.

The Bostroms also claim that Cal West did not operate solely within the leased premises; rather, it "had the full run of Chino Airport." The evidence, however, merely shows that Cal West dispensed fuel from a truck. The Bostroms argue that inferably the truck was used to take fuel to planes which needed refueling. Even assuming that this is a permissible inference, however, it is consistent with a lessor-lessee relationship. Where a lease is for a

---

[13]The Bostroms similarly disavow any reliance on the fact that the County had a right to enter and inspect the leased premises. Nevertheless, we note that this is another standard provision in both commercial and residential leases. (CEB, § 3.131, pp. 172-174.)

portion of larger premises, normally the lessee and its customers are permitted to use the common or public areas of the premises as necessary for the operation of the lessee's business. (Miller & Starr, *supra*, § 18:87, p. 213; CEB, *supra*, §§ 3.15-3.16, pp. 59-60.)

Finally, the Bostroms point out that on the day of the crash, when Ms. Asbury refused the customer's request that she refuel both a jet and Mr. Bostrom's Piper, Mr. Merry, the County's Airport Manager, ordered Cal West to refuel both aircraft. Mr. Merry took the position that Ms. Asbury's refusal violated a provision of the lease requiring Cal West to provide fueling services as needed.[14] In *Stanford*, however, the City asserted control over the contractor to the extent of specifying "rigid specifications" and "compell[ing] compliance with numerous detailed provisions" for the work. (6 Cal.3d at p. 874.) Nevertheless, the court found such control was consistent with a permit issuer-permittee relationship, and hence not evidence of an employer-independent contractor relationship. In *White*, on the other hand, Uniroyal exercised control over Teledyne that went far beyond the typical vendor-purchaser relationship: it shared Teledyne's proprietary data; it authorized Teledyne to construct a new facility; it inspected the new facility; and it recommended changes in the new facility to promote safety. Here, it appears that the County was merely asserting its rights under Cal West's covenant of continuous operation. The degree of control the County exercised, on one or at most two occasions, did not go beyond that consistent with a lessor-lessee relationship.

Accordingly, we conclude that there was insufficient evidence to raise a triable issue of fact as to whether the County was liable under the independent contractor exception.

## VI.

### RESPONDEAT SUPERIOR: LIABILITY FOR THE NEGLIGENCE OF COUNTY EMPLOYEES*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

[14]Similarly, one time when Cal West was unavailable, the County took Cal West's fuel truck and used it to refuel a plane. The County claimed afterward that Cal West had violated its lease.

*See footnote, *ante*, page 1654.

## VII.

### DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and McDaniel, J.,* concurred.

A petition for a rehearing was denied July 13, 1995, and appellants' petition for review by the Supreme Court was denied September 20, 1995.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.