Filed 4/20/21  Elliott v. The Regents of the University of Cal. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANNETTE ELLIOTT,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Defendant and Respondent. | A157589<br><br><br>(City & County of San Francisco Super. Ct. No. CGC-15-549188) |
| YOLANDA JEFFERSON,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Defendant and Respondent. | A157655<br><br><br>(City & County of San Francisco Super. Ct. No. CGC-15-549189) |

Plaintiff employees Annette Elliott and Yolanda Jefferson each asserted a claim against defendant The Regents of the University of California (Regents) for the negligent hiring, training, and supervision of its former employee Kian Lam, after it was discovered that Lam used a hidden camera to record plaintiffs in the office bathroom.  The Regents successfully moved for summary judgment in both cases, and judgments were entered in their favor.  On appeal, plaintiffs argue that the orders and judgments should

1

be reversed because: (1) Government Code section 815.2[1] provides a sufficient statutory basis to impose direct liability on the Regents; (2) there was a special relationship with plaintiffs that established a duty of care to support vicarious liability; (3) the trial court erred in its analysis and consideration of evidence on the foreseeability of Lam's acts; and (4) the trial court abused its discretion in denying plaintiffs' request for leave to further amend their complaints. We affirm.

## FACTUAL BACKGROUND[2]

In December 2014, plaintiffs and Lam were employed by the Regents as administrative assistants at the University of California, San Francisco (UCSF), Medical Center Sleep Disorders Center. Kimberly Trotter was the direct supervisor of plaintiffs and Lam. According to plaintiffs, fellow assistant Ashleigh "Tu" Grimalauskas also performed supervisory activities at this time, even though she was not formally promoted to a supervisor position until March 1, 2015.

According to Elliott, she previously reported to Trotter that "Lam was doing something illegal and that he was giving me was [sic] an eerie feeling." She also reported to Grimalauskas that she was "uncomfortable" with Lam's coming into the office after hours because no one was around to supervise him.

According to Jefferson, she had also reported to Trotter that Lam's "suspicious" behavior was making her uncomfortable. Lam had mounted a mirror on his desk, which he used to observe plaintiffs, and would lock

---

[1] Unless otherwise indicated, all further section references will be to the Government Code.

[2] All of the facts set forth herein are undisputed unless otherwise noted. Only facts necessary to the resolution of the appeal are recited.

2

himself in the chartroom with his laptop. Jefferson attested that she expressed her concerns on these issues to her union representatives, which were relayed to Trotter.

According to both Grimalauskas and Lam, Grimalauskas noticed Lam wearing a pen around his neck and asked Lam if it was a recording pen. Lam responded that "it was just voice recording." According to Jefferson, however, she overheard the conversation and Lam told Grimalauskas "it was a camera disguised as a pen . . . ."

Grimalauskas came into Trotter's office on December 4, 2014, after finding a pen camera in the tampon dispenser of the unisex office bathroom. Trotter took the camera and immediately called the university police. Trotter attested that prior to December 4, 2014, she received no reports of a hidden camera or of anyone's suspecting that Lam was filming people in the restroom. She did not know that Lam had ever brought any kind of filming device to work. Each plaintiff had "voiced her concern" that Lam was "making frequent trips to the bathroom," and Elliott had reported that Lam was "staying in the bathroom a long time . . . ." Staff had also complained that Lam "acted angry" and had a "poor attitude." But Trotter attested that neither plaintiff had ever voiced a concern or suspicion that Lam was "committing any illegal activity or sexually harassing people in the bathroom."

According to plaintiffs, no one was aware of the camera's being in the dispenser before it was discovered. No one suspected Lam was filming in the bathroom before the camera was found.

Lam resigned on January 8, 2015. According to Lam, he put the camera in the restroom approximately eight months before it was discovered, in order to obtain pictures of Grimalauskas.

## PROCEDURAL BACKGROUND

On December 1, 2015, plaintiffs each filed a complaint against the Regents, UCSF (as part of and governed by the Regents), and Lam.[3] Plaintiffs filed amended complaints on May 5, 2016, asserting causes of action for (1) invasion of privacy, (2) intentional infliction of emotional distress, (3) negligence, (4) dangerous condition of public property, and (5) sexual harassment.

On December 20, 2017, the Regents moved for summary judgment in both cases. The trial court granted the motions as to all five causes of action against the Regents. The trial court found that the Regents were not vicariously liable for plaintiffs' claims "because defendant Kien Lam's misconduct was not within the scope of his employment nor was it ratified by The Regents." But the trial court also granted in part plaintiffs' motions for leave to file second amended complaints, limited to a single cause of action against the Regents "for negligence based solely on the alleged negligent hiring, training and supervision of the Regents' employees."

On July 20, 2018, plaintiffs filed their second amended complaints asserting a negligence cause of action against the Regents. They alleged that the Regents "negligently hired, trained and or [*sic*] supervised its employees." They also alleged that the Regents were liable for Lam's acts pursuant to section 815.2.

On August 14, 2018, the Regents again moved for summary judgment in both cases. The Regents argued that they had no direct liability for the alleged negligent hiring, training, and supervision of their employees because plaintiffs had not alleged a statutory basis for such a claim. They also argued that the Regents had no vicarious liability because: (1) Trotter was not in a

---

[3] Lam is not a party to this appeal.

4

special relationship with plaintiffs and had no actual knowledge of Lam's criminal propensity; and (2) Lam's actions were not foreseeable in any way, nor did the Regents adopt or ratify his actions.

Plaintiffs opposed the motions. On the issue of direct liability, plaintiffs argued that Government Code section 815.2 provided a sufficient statutory basis but alternatively requested leave to amend to add bases under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), Labor Code section 6400 et seq., and Code of Civil Procedure section 527.8. On the issue of vicarious liability, plaintiffs argued that there was a special relationship with plaintiffs that established a duty of care and that the foreseeability of Lam's actions was a question of fact for the jury.

The trial court granted the summary judgment motion as to Jefferson on October 11, 2018, and as to Elliott on December 18, 2018. As to plaintiffs' direct liability theory, the trial court explained, "Regents, as a public entity, is not directly liable for the negligent supervision of Kien Lam because no statutory basis for direct liability has been identified." As to plaintiffs' vicarious liability theory, it determined that "the authorities cited by Plaintiff[s] ha[ve] not recognized that an employment relationship constitutes a special relationship giving rise to a duty of control—to control, warn or protect a victim from criminal acts of a third party."

The trial court continued that even assuming a special relationship giving rise to a duty of care, "a reasonable trier of fact would not find that Mr. Lam's supervisors were on notice about his criminal propensity to engage in secret video recordings of his coworkers in the restroom. There is no admissible evidence that either Ms. Trotter or Ms. Grimalauskas were [*sic*] aware that the pen was a camera, and Mr. Lam's unusual frequent use of the restroom, his angry outbursts, or afterwork access to the premises were

5

insufficient to put anyone on notice of a foreseeable risk of his invasion of privacy or sexual harassment of coworkers." The trial court did not explicitly rule on plaintiffs' requests for leave to amend but granted the summary judgment motions in full.

Judgment was entered for the Regents and against Elliott on March 26, 2019. Judgment was entered for the Regents and against Jefferson on March 29, 2019. Plaintiffs timely appealed, and the appeals were consolidated.

## DISCUSSION

Plaintiffs argue that the trial court erred in granting summary judgment for four reasons. First, plaintiffs argue that section 815.2 was a sufficient statutory basis for direct liability on their claim against the Regents for the alleged negligent hiring, training, and supervision of Lam. Second, plaintiffs argue that there was a special relationship with plaintiffs that established a duty of care to support vicarious liability on their claim. Third, plaintiffs argue that the trial court erred in its analysis and consideration of evidence as to the foreseeability of Lam's acts. Fourth, plaintiffs argue that the trial court abused its discretion in denying their request for leave to amend to allege additional statutory bases for direct liability.

The Regents initially respond that the judgments should be affirmed because plaintiffs failed to provide an adequate record on appeal, omitting the Regents' summary judgment motions and evidence, but that plaintiffs' arguments nonetheless fail on their merits. As the Regents submitted an appendix with these missing documents, we conclude that the record is sufficient to review the trial court's orders. (*Modaraei v. Action Property*

6

*Management, Inc.* (2019) 40 Cal.App.5th 632, 636, fn. 6.)  We begin with an overview of summary judgment principles.

## I.  SUMMARY JUDGMENT

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more of its elements cannot be established or is subject to an affirmative defense.  (*Id.*, subds. (p)(2), (o); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  Once a defendant meets this burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 850.)

On appeal, we review orders granting a summary judgment motion de novo.  (*Aguilar, supra*, 25 Cal.4th at p. 860.)  "We exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' "  (*Lockhart v. County of Los Angeles* (2007) 155 Cal.App.4th 289, 303.)  We must affirm the trial court's order granting summary judgment "if it is correct on any ground that the parties have had an adequate opportunity to address on appeal, regardless of the trial court's stated reasons."  (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 71.)  We also must " 'view the evidence in the light most favorable to plaintiffs as the losing parties' and 'liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor.' "  (*McDonald v.*

*Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.) With these principles in mind, we turn to plaintiffs' claim against the Regents.

## II. NEGLIGENCE CLAIM AGAINST THE REGENTS

Plaintiffs' second amended complaints were limited to a single cause of action against the Regents for the negligent hiring, training, and supervision of Lam. Because the Regents are a public entity (§ 811.2),[4] plaintiffs' tort claim is subject to certain limitations provided in the Government Claims Act (§ 810 et seq.) (Act). The Act draws a clear distinction between two theories of potential liability of a public entity: (1) direct liability, based on the public entity's own conduct and legal obligations; and (2) vicarious liability, arising from the misconduct of a public entity's employee that occurred in the scope of his or her employment. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127 (*Zelig*).) We address each theory in turn.

### A. Direct Liability

For direct liability, the Act provides that a public entity is *not* liable for an injury that arises out of its own acts or omissions *except* as otherwise provided by statute. (§ 815, subd. (a).) Accordingly, while certain statutes do provide for liability of a public entity, a public entity is generally not liable for its own conduct to the same extent as a private person or entity. (*Zelig, supra*, 27 Cal.4th at p. 1127.) As the California Supreme Court has explained, "the intent of the act is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances . . . ." (*Williams v. Hovath* (1976) 16 Cal.3d 834, 838.)

---

[4] Section 811.2 defines a "public entity" for the purposes of the Government Claims Act.

8

Pursuant to this limitation, "direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714." (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1183 (*Eastburn*).) Here, plaintiffs argue that they have met this requirement for direct liability because their second amended complaints allege that the Regents are directly liable on their claim pursuant to Government Code section 815.2.

We do not find the argument persuasive, as section 815.2 makes a public entity *vicariously liable* for an employee's negligent acts or omissions. (*Eastburn, supra*, 31 Cal.4th at p. 1184.) Section 815.2, subdivision (a) provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Plaintiffs only cite authority on vicarious liability, not direct liability, for their position that section 815.2 is a sufficient statutory basis for their claim. (E.g., *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*) [explaining that public entity employers are "vicariously liable for employees' negligent acts within the scope of their employment" under § 815.2, subd. (a)].) We thus conclude that the trial court did not err in determining that plaintiffs failed to identify a statutory basis for direct liability.[5]

---

[5] Given our conclusion, we need not address plaintiffs' argument that, under their direct liability theory, there was a special relationship between plaintiffs and the Regents giving rise to a duty of care.

9

## B. Vicarious Liability

We turn next to plaintiffs' theory that the Regents are vicariously liable based on Trotter and Grimalauskas's negligent hiring, training, and supervision of Lam. "When assessing a claim for vicarious liability against a governmental employer based on the acts or omissions of its employee, a court must examine whether the employee who acted or failed to act would have been personally liable for the injury." (*de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 249 (*de Villers*).)

*de Villers* describes the relevant framework to determine whether an individual may be personally liable for an injury based on his or her alleged negligent supervision of another. "As a general rule, citizens do not have a duty to prevent criminal attacks by third parties. [Citation.] Although an exception might exist when the citizen bears some special protective relationship to the victim *and* has *actual* knowledge of the assaultive propensities of the criminal actor, a citizen 'cannot be liable under a negligent supervision theory . . . based solely on constructive knowledge or information they should have known.' " (*de Villers, supra*, 156 Cal.App.4th at p. 249.) Accordingly, we must decide whether Trotter or Grimalauskas would have been personally liable for the injury alleged here because they (1) had some special protective relationship with plaintiffs and (2) had actual knowledge of Lam's criminal propensity.[6] We address each element in turn.

### 1. Special Protective Relationship

A "special protective relationship" that imposes a duty to act can arise from four different sources: (1) the nature of the relationship; (2) a contract;

---

[6] In light of our conclusion on direct liability and the applicable standard for vicarious liability, we need not address plaintiffs' arguments that the trial court erred in its foreseeability analysis and its consideration of evidence relevant to foreseeability.

(3) statutes or government regulations; and (4) conduct creating the peril. (*de Villers, supra*, 156 Cal.App.4th at p. 249; *Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 437–438.) As plaintiffs have not identified any applicable contract, statute, regulation, or affirmative conduct, we consider the first category: the nature of plaintiffs' relationships with Trotter and Grimalauskas.

The Restatement Third of Torts identifies several categories of special relationships where an individual "owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship." (Rest.3d Torts, Liability for Physical and Emotional Harm, § 40, subd. (a).) Among other categories, the list includes "a business or other possessor of land that holds its premises open to the public with those who are lawfully on the premises" (*id.*, subd. (b)(3)); "an employer with its employees who, while at work, are: [¶] (a) in imminent danger; or [¶] (b) injured or ill and thereby rendered helpless" (*id.*, subd. (b)(4)); and "a school with its students" (*id.*, subd. (b)(5)). None of these categories include the type of supervisor–employee or coworker relationships plaintiffs had with Trotter and Grimalauskas.

Moreover, plaintiffs cite no authority that recognizes a special relationship between a supervisor and an employee or between coworkers. In *Regents*, for example, a student at the University of California, Los Angeles (UCLA), sued the Regents after being stabbed by another student in a chemistry laboratory. (*Regents, supra*, 4 Cal.5th at p. 617.) The California Supreme Court concluded that UCLA had a limited duty to protect the student under the alleged circumstances. (*Id.* at p. 620.) It explained: "Considering the unique features of the college environment, we conclude postsecondary schools *do* have a special relationship with students while they

11

are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." (*Id.* at pp. 624–625.) The school–student relationship from *Regents* is not applicable here.

In *Morris v. De La Torre* (2005) 36 Cal.4th 260, 267, a customer sued a restaurant for negligence under a premises liability theory after being repeatedly stabbed by another customer in the restaurant's parking lot. The restaurant employees stated that they did not call the police or emergency personnel because the phone was disabled. (*Ibid.*) The appellate court explained that a restaurant proprietor "owes a special-relationship-based duty to undertake reasonable and minimally burdensome measures to assist customers or invitees who face danger from imminent or ongoing criminal assaultive conduct occurring upon the premises." (*Id.* at p. 270.) The proprietor–customer relationship from *Morris* is not applicable here.

In *Miller v. Pacific Constructors, Inc.* (1945) 68 Cal.App.2d 529, 536, a contractor and its superintendents were sued after an inspector fell while trying to conduct a test at the construction site. The contract for the work provided that the contractor shall be " '*responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work , . . .*' " (*Id.* at p. 535, original italics.) The appellate court determined that the jury's $30,000 verdict to the inspector was adequately supported by the evidence because he was an invitee who accessed the premises for the purposes of inspection, and the contractor was responsible for damages under the terms of the contract. (*Id.* at pp. 537–538.) Unlike *Miller*, plaintiffs are not third party invitees and there is no contractual duty asserted here.

Finally, plaintiffs assert that *Johnson v. Open Door Community Health Centers* (2017) 15 Cal.App.5th 153, 160, notes a duty of an employer to

employees. As a preliminary matter, any employer–employee duty is irrelevant to our analysis here because plaintiffs had a supervisor or coworker relationship with Trotter and Grimalauskas. In any event, plaintiffs misquote *Johnson*, which described the *allegations* in that case made by a patient suing a health clinic, claiming that the clinic owed a duty to all users of its facility, including employees. It was not the appellate court's holding. (*Ibid.*) The issue in *Johnson* was whether the statute of limitations for professional negligence, versus ordinary negligence, should be applied. (*Id.* at p. 157.)

We conclude that plaintiffs have not shown that their relationship with Trotter or Grimalauskas was a "special protective relationship" that supports the imposition of vicarious liability on their negligent hiring, training, and supervision claim. (*de Villers, supra*, 156 Cal.App.4th at p. 249.) Indeed, to the extent that Grimalauskas was a coworker of plaintiffs, *de Villers* explains why plaintiffs' assertion is problematic. For example, under their theory, a coworker who suspects that a fellow employee might have a substance abuse problem "would be potentially liable for failing to anticipate and prevent criminal assaults by the perpetrator." (*Id.* at p. 250.) The "special relationship" element protects against such a result.

2.      Actual Knowledge of Criminal Propensity

Even if plaintiffs had shown a special protective relationship with Trotter or Grimalauskas, their theory fails on the second element of actual knowledge of Lam's criminal propensity. (*de Villers, supra*, 156 Cal.App.4th at p. 249.) The undisputed facts show that no one was aware of the camera's being in the dispenser before it was discovered and that no one suspected Lam was filming in the bathroom before the camera was found. Trotter did not know that Lam had ever brought any kind of filming device to work. Lam

13

told Grimalauskas that the pen he wore around his neck was only for "voice recording."[7] While Trotter and Grimalauskas may have known that Lam had "acted angry" or given plaintiffs an "eerie" feeling, the undisputed evidence shows that they had no actual knowledge of Lam's criminal propensity to engage in secret video recordings of his coworkers in the restroom.

In sum, we conclude that plaintiffs failed to establish that Trotter or Grimalauskas would have been personally liable for the injury, and thus their vicarious liability theory against the Regents fails.

## III.   DENIAL OF LEAVE TO AMEND

Plaintiffs argue that, assuming their second amended complaints did not identify a statutory basis for direct liability, the trial court abused its discretion when it refused their requests for leave to amend. In their summary judgment oppositions, plaintiffs requested leave to add FEHA, Labor Code section 6400 et seq., and Code of Civil Procedure section 527.8 as statutory bases for direct liability.

As a general rule, the operative pleadings define the scope of the case on summary judgment, and summary judgment "cannot be *denied* on a ground not raised by the pleadings." (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663.) Trial courts, however, are also tasked to apply "a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings . . . ." (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746 (*Huff*).) Accordingly, "[i]f the opposing party's evidence would show

---

[7] Plaintiffs contend that there is a dispute of fact based on Jefferson's attestation that she overheard the conversation between Lam and Grimalauskas and that Lam told her that "it was a camera disguised as a pen . . . ." The Regents objected to this evidence on several grounds, including hearsay. We agree that the statement is inadmissible hearsay. (Evid. Code, § 1200.)

some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264–1265.)

Even if a party requests leave to amend, however, the trial court may deny the request if no liability exists under the party's new proposed theory. (*Huff, supra*, 138 Cal.App.4th at p. 746.) A trial court may also deny the request if it would cause prejudice to the other party or if the party seeking to amend has failed to act diligently in requesting amendment. (*Ibid.*) We review the trial court's denial of leave to amend for abuse of discretion. (*Ibid.*)

Here, plaintiffs offer no authority for their position that FEHA, Labor Code section 6400 et seq., or Code of Civil Procedure section 527.8 provides a statutory basis for plaintiffs' direct liability claim as to the Regents' allegedly negligent hiring, training, and supervision of Lam. Instead, plaintiffs cite *Franklin v. The Monadnock Co.* (2007) 151 Cal.App.4th 252, 259–260, which concluded that a wrongful termination claim was sufficiently pleaded to survive demurrer because Labor Code section 6400 et seq. and Code of Civil Procedure section 527.8 "establish an explicit public policy requiring employers to provide a safe and secure workplace . . . ." Plaintiffs also cite *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1014, 1019–1020, which concluded that the county was not obligated to indemnify one of its deputy sheriffs against a sexual harassment lawsuit but noted that public entities may be directly liable on sexual harassment claims under FEHA. Neither of these cases is on point.

Moreover, plaintiffs never sought to add these statutory references until they made their request in opposition to summary judgment, almost

15

three years after filing their original complaints and after already receiving one opportunity for leave to amend at the summary judgment stage. Plaintiffs proffer no explanation for this unreasonable delay, and it would be patently unfair to allow plaintiffs to defeat the Regents' summary judgment motions by allowing them to present these new, unsupported legal theories. We thus conclude that the trial court did not abuse its discretion in rejecting plaintiffs' request for leave to amend.

## DISPOSITION

The judgments are affirmed.  Respondent is entitled to recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A157589/*Elliott v. Regents of U. of Cal.*
A157655/*Jefferson v. Regents of U. of Cal.*


17